FIRST NATIONAL BANK OF SOUTH
CAROLINA, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 74–1591.

United States District Court,
D. South Carolina,
Columbia Division.

April 6, 1976.

Charles W. Knowlton and J. Donald Dial, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S. C., for plaintiff.

Glen E. Craig, Asst. U. S. Atty., Columbia, S. C., and John A. Townsend, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

HEMPHILL, District Judge.

Plaintiff-taxpayer and the government have each moved for summary judgment in this action claiming refund of federal income taxes and brought pursuant to Section 7422 of the Internal Revenue Code of 1954, 26 U.S.C. § 7422. The sole question involved is the propriety of the IRS' disallowance of certain deductions by the bank during the 1968 tax year as ordinary and necessary business expenses within the meaning of Section 162 of the Internal Revenue Code of 1954.[1] The parties have completed a commendable pursuit of discovery and entered into an extensive stipulation of facts for purposes of this litigation. There is no dispute that jurisdiction is proper in this court, nor is there a genuine issue as to any material fact.

Plaintiff has acknowledged an error in its original claimed deduction of $72,400.40, which the IRS disallowed entirely. The amount claimed should have been only $63,-350, and the bank therefore consents to entry of partial summary judgment in favor of the government to the extent of that error. The remaining amount at issue in this litigation is that portion of the taxes and interest assessed against plaintiff which is attributable to the disallowance of the $63,350 deduction.

I

The taxpayer, First National Bank of South Carolina, is and has been for some years, a nationally chartered, "full service" bank providing a complete variety of general banking services and customer loans.

Taxpayer's loan services at times included loans to merchants secured by accounts receivable and small loans of less than $500, but such loans were not actively sought by the bank because of their minimal potential for profit. The bank made substantially more consumer loans on an installment basis for such purchases as automobiles and boats since the larger amounts involved (typically $1000 or more) allowed an identical investment to produce a greater return at the same interest rates due to decreased administrative and clerical costs.

In 1968, taxpayer decided to enter the credit card field and on July 31, 1968, obtained the right to market the Master Charge card in its service area. By that date, the operation of national credit card systems had become economically feasible due to advances in computer technology and decreased costs for basic computer services. The mechanics of bank credit card systems include generally a discounting of accounts receivable to the bank by merchants, extension of credit by the bank to cardholders at a stated rate of interest, and an interchange agreement between banks for clearing and processing credit card sales slips in much the same manner as the same banks process checks. Taxpayer's decision to enter the credit card field had two principal bases: the prospect of greater return on previously low-profit consumer loans and a desire to retain its "full service" reputation and remain competitive with other banks offering the same or similar credit card systems. It is not disputed that many or most of taxpayer's new credit cardholders and a significant number of the merchants cooperating in the system initially were existing customers of the bank.

After obtaining authorization to market Master Charge cards, taxpayer and a number of other banks considered relatively small by national standards joined to establish and operate a computerized system for record keeping, authorization, and billing of

---

1. Section 162(a) provides: Trade or business expenses

 (a) In general.—There shall be allowed as a deduction all the ordinary and necessary ex- penses paid or incurred during the taxable year in carrying on any trade or business . . .

credit card transactions. The Atlantic States Bankcard Association, Inc. (ASBA)[2] was incorporated on October 15, 1968 by approximately 22 member banks to avoid duplication of services and provide economics of scale in processing bank card data. The ASBA was formed as a non-profit corporation under the laws of North Carolina. The banks are members of the Association, but there is no stock and no stockholder. The members have no interest in the assets of the ASBA and are entitled to no share of its assets upon termination of their membership or upon dissolution of the ASBA. Upon dissolution of the ASBA, all of its net assets must be paid over a tax-exempt charitable organization. Membership is non-transferrable and no part of the net earnings of the ASBA may inure to the benefit of any member, and no distribution of profits or dividends is permitted.[3]

The ASBA became operational March 11, 1969; on that date it began processing transactions for its member banks and meeting expenses by charging each member a set fee for each transaction completed. Thereafter, other banks were encouraged to join the ASBA, as they would contribute to the economies of scale and reduce per transaction costs for existing members. No initiation or membership fee was charged. New members were charged $1.50 per cardholder account to cover the ASBA's expenses ($.90 per account for advertising in the trading area of the new member and $.60 per account for the expenses of adding the new bank's accounts to the ASBA files and data processing system). A new bank was also charged an additional $.60 per account for issuing plastic cards.

Prior to the operational phase of the ASBA, however, substantial expenses were incurred by the organization, including fees paid to a consulting firm, employee salaries, rental of offices and equipment, office expenses, and advertising costs. To cover these pre-operational expenses, the ASBA assessed each member bank on the basis of its total deposits; prior to actual operation of the system, charging on a per transaction basis obviously was impossible, but each member's total deposits constituted the best available measure of expected future use. An initial assessment of $50 per million dollars in deposits was made in August, 1968 and taxpayer was charged $9,050. Three additional assessments in the amount of $100 per million dollars in deposits were made December 1 and December 24, 1968. Taxpayer's obligation was $18,100 on each, and the total of the four assessments was $63,350.

During 1968 taxpayer reported income for the calendar year on the accrual basis for both tax and financial reporting purposes. The assessments noted above were listed as deductions in taxpayer's federal income tax return and in its financial reports to its shareholders, to the Comptroller of the Currency, and to other federal regulatory bodies. As was previously indicated, the IRS disallowed the deductions and assessed additional taxes and interest; taxpayer paid the assessment, filed claim for refund which was disallowed, and brought this suit.

2. The organization was originally chartered as the Atlantic Bankcard Association, Inc. (ABA) but the name was later changed to avoid possible confusion with the common abbreviation for the somewhat better known American Bar Association.

3. The ASBA members simultaneously incorporated the Atlantic Bankcard Properties Corporation as an ordinary "for profit" business corporation and has capital stock outstanding which is owned by the stockholders, which are certain banks. The Properties Corporation's only business is to own and lease to the ASBA the assets needed in its business, such as the land and building which the ASBA occupies, fixtures, furniture, office equipment and the computer software package which is used by the ASBA. Two separate corporations were formed so the banks could recoup the capital invested in tangible property in the event their cooperative venture did not work out. Since the ASBA was to be non-profit and its charter was to forbid distribution of any property to its members, the Properties Corporation was formed to hold title to tangible property necessary for the operation. Except for the manner in which its operation contrasts with that of the ASBA, the Properties Corporation is not involved in this suit, however, since taxpayer claimed deductions only for payments it made to the ASBA.

## II

The only reported decision involving the question presented in this case appears to be *Colorado Springs Nat'l Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974). In that case the court decided in favor of the taxpayer on facts so similar to those presented here that it is unnecessary to recite them. The government understandably makes no effort to distinguish *Colorado Springs* but argues that it is in direct conflict with the conclusion of the Fourth Circuit in *Georator Corp. v. United States,* 485 F.2d 283 (4th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974). The opinion of Judge Field in *Georator* is well-reasoned and undoubtedly correct and would of course be controlling if it were dispositive of the issue presented in this case. *Georator* and the equally well-reasoned decision in *Colorado Springs,* however, are simply not in conflict. As the discussion below indicates, the two decisions are not inconsistent and the question presented in this case may properly be regarded as one of first impression in this circuit.

## III

■ The vital role which bank credit cards play in modern American society is unquestionably a proper subject for judicial notice. The Master Charge card involved here and its equally significant competitors have become a way of life for the American consumer and a boon to the banks which issue and service them.[4] Despite their meteoric rise to prominence, however, bank cards represent nothing more than a new, albeit more efficient and profitable, method of providing services which most banks have always rendered. The discounting of accounts receivable which is vital to the operation of any card system is merely a more direct version of ordinary bank loan secured by the same accounts receivable. The credit cardholders receive nothing more than an indirect and perhaps more expen-

sive, loan for consumer purchases, and the function of the card for cooperating merchants is virtually indistinguishable from that which letters of credit have served for decades.

■ The conclusion is inescapable that banks such as this taxpayer which enter the credit card field are simply expanding the scope and profitability of their existing business and are not establishing or attempting to establish a new business. Since this is so, taxpayer has established that the items claimed as deductions were for "carrying on any trade or business." That characteristic and four additional ones are recognized as essential in establishing any item as an allowable deduction under § 162(a) of the Internal Revenue Code. In *Commissioner v. Lincoln Savings & Loan Ass'n,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971) the Court listed the five factors: "An item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense."

■ The government does not dispute that the assessments were expenses incurred during the taxable year, and there can be no question that they were also "necessary" in the sense that they were "appropriate and helpful" to "the development of the [taxpayer's] business." *Commissioner v. Lincoln Savings, supra,* 403 U.S. at 353, 91 S.Ct. at 1898; *Commissioner v. Tellier,* 383 U.S. 687, 689, 86 S.Ct. 1113, 1120, 16 L.Ed.2d 185 (1966); *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). As was previously indicated, the assessments paid by taxpayer in expanding its existing banking business were also for "carrying on any trade or business" within the meaning of § 162(a). The critical distinction in this area is between expenses incurred in connection with an existing trade or business, which are deductible under § 162(a), and expenses incurred in es-

---

4. The astronomical balances and resulting interest charges which some cardholders inflict upon themselves lead the court to question whether the cards are a boon to the consumer

as well as to the banks. In retrospect, to those of a more conservative philosophy, bankcards are immoral for encouraging debt, sometimes reckless debt.

tablishing an entirely new business, which are not deductible. The court's holding in *Richmond Television Corporation v. United States,* 345 F.2d 901 (4th Cir. 1965), *vacated on other grounds,* 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143, for example, affirmed an IRS ruling of nondeductibility for expenses incurred by a radio station in preparing to enter television broadcasting. Taxpayer's activities here, however, constitute a new method, not a new business and generated deductible expenses. *Cf. Colorado Springs Nat'l Bank v. United States, supra,* relying in part upon *Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775 (2d Cir. 1973), where the court held deductible expenses were incurred when an urban-oriented retail and wholesale candy company with declining sales set up a franchise division to make agency and franchise agreements with non-owned retail outlets in suburban areas.

### IV

The only remaining question is whether taxpayer's expenses were "ordinary" under § 162(a), and the Supreme Court has stated in *Lincoln Savings:*

> The principal function of the term "ordinary" in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset. 403 U.S. at 353, 91 S.Ct. at 1899, *quoting Commissioner v. Tellier,* 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966).

The distinction is indeed difficult; courts have long searched for some distinct guidelines to simplify the determination of what expenses are "ordinary." In many cases, where expenses resulted in the acquisition or protection and maintenance of an asset with a useful life of more than one year, the benefit beyond the taxable year was deemed a controlling factor and the courts

required capitalization rather than deduction of the expenses. *E. g., United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972); *Georator Corp. v. United States,* 485 F.2d 283 (4th Cir. 1973); *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974).

In *Lincoln Savings,* however, the Court held:

> [T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

> What is important and controlling, we feel, is that the § 404(d) payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here. 403 U.S. at 354, 91 S.Ct. at 1899.

The assessments in this case cannot be regarded as creating for the bank anything remotely similar to the "distinct and recognized property interest" which the Court in *Lincoln Savings* found that the taxpayer had acquired. Membership in the ASBA is non-transferrable and has no intrinsic value; it actually costs nothing, because each member's obligation is only the amount of those assessments made to cover its pro rata share of the non-profit organization's actual expenses. The assessments paid by taxpayer to defray ASBA expenses prior to its functional operation appear indistinguishable from the start-up charges now assessed to new members, or for that matter, from the per transaction fees paid by all participants. Further, taxpayer has no salable asset from which it could ever recoup the assessments which the government says it must capitalize but would be unable to depreciate or amortize.[5] The fact of the

---

5.  In its brief, the government takes the position that the cost-saving benefit for which the assessments were incurred will extend indefinitely into future years and hence the plaintiff could not make the required showing of a rea-sonably ascertainable useful life upon which to found a claim for depreciation. See Treasury Regulations on Income Tax, § 1.167(a)–3, *supra; Richmond Television Corp. v. United States,* 354 F.2d 410 (C.A.4, 1965).

matter is that taxpayer's expenditures for ASBA assessments were payments of recurring charges for current expenses incurred in implementing a significant new method of conducting an existing business. Their current deduction is allowable under § 162(a) and accurately reflects their relationship to taxpayer's income. This court thus arrives at the same conclusion reached by the Tenth Circuit in *Colorado Springs, supra,* and both decisions are consistent with the result in *Briarcliff Candy Corp. v. Commissioner.*

The government is incorrect in its contention that the conclusion reached here and in *Colorado Springs* is inconsistent with the law of this circuit as stated in *Georator Corp. v. United States,* 485 F.2d 283 (4th Cir. 1973). *Georator* involved the deductibility of legal fees incurred in defense of a registered trademark and the court required their capitalization in the same manner as cost of obtaining the original registration. In its opinion the court commented:

> Nor is it necessary that an expenditure increase the value of an asset in order to be classified as a capital expenditure, as the district court apparently assumed. Costs of defending title to property, although adding nothing to the value of the property, have been held to be capital expenditures. *Garrett v. Crenshaw,* 196 F.2d 185 (4 Cir. 1952); *Bowers v. Lumpkin,* 140 F.2d 927 (4 Cir. 1944).

The government would have the passage construed to mean that there need be no asset at all to which items classified as capital expenditures can be tied. In *Georator,* however, the Court assumed the existence of a definite asset, the trademark, and the quoted language serves to dismiss taxpayer's argument that its legal fees should not be capitalized because they only maintained and did not enhance the value of the trademark. *Georator* was correctly decided, but it is not inconsistent with the result in this case, where neither party can identify or define any asset upon which taxpayer's assessment expenditures have had any effect.

## V

■ The Comptroller of the Currency who is charged by Congress with supervision and regulation of national banks has ruled that expenditures by commercial banks for the development and implementation of credit card programs must be charged to expense rather than capital. In an August 21, 1972, letter to the Assistant Secretary for Tax Policy, U. S. Treasury Department, he wrote that:

> It is the long-established policy of this Office to require National Banks to charge to current operations all expenditures relating to the development and expansion of banking services, including those incurred in credit card programs. This policy has as its basis our responsibility of assuring the solvency and liquidity of National Banks and the concurrent protection of depositories and shareholders.

In addition, the Comptroller stated his opinion that if the current deduction of such expenditures is disallowed,

> banks will be reluctant to expend funds to develop, expand, and make technological advances in banking services. Clearly, such a result would be contrary to the objectives of our expanding national economy.

Taxpayer correctly argues that "some, although not controlling, weight" must be given to the Comptroller's views. "Although agency-imposed compulsory accounting practices do not necessarily dictate tax consequences, they are not irrelevant and may be accorded some significance. *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974). The court in *Colorado Springs* agreed that the action of the comptroller was not determinative but was "a factor for consideration." The same conclusion of course must be reached in this case. The Comptroller's position is both logical and consistent with the authoritative interpretation of § 162(a). Moreover, "where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method clearly re-

flects income, it is almost presumptively controlling of federal income tax consequences." *Commissioner v. Idaho Power Co.,* 418 U.S. at 15, 94 S.Ct. at 2766; *see also* Int.Rev.Code of 1954, § 446 [26 U.S.C. § 446].

## CONCLUSION

Since the court concludes that the payments at issue here were properly deducted by taxpayer as ordinary and necessary expenses under § 162(a), taxpayer's motion for summary judgment is granted and the government's motion for summary judgment is denied except to the extent noted in the first paragraph of this order. Taxpayer is entitled to a refund of the taxes and interest attributable to the IRS' disallowance of $63,350.00 as a deduction pursuant to § 162(a) of the Internal Revenue Code of 1954, and its motion for summary judgment is granted to that extent. The remaining $9,050.40 claimed as a deduction was properly disallowed; taxpayer is not entitled to recover the taxes and interest attributable thereto and the government's motion for summary judgment to that extent is granted.

AND IT IS SO ORDERED.