JACK'S COOKIE COMPANY, Appellee,

v.

The UNITED STATES of America, Appellant.

No. 77–2210.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1978.

Decided April 25, 1979.

Timothy B. McBride, Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Ann Belanger Durney, Joseph L. Liegl, Tax Div., Dept. of Justice, Washington, D. C., Harold M. Edwards, U. S. Atty., Asheville, N. C., on brief), for appellant.

George R. Hodges, Charlotte, N. C. (James O. Moore, Moore & Van Allen, Charlotte, N. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, BUTZNER, Circuit Judge, and FIELD, Senior Circuit Judge.

FIELD, Senior Circuit Judge:

On its income tax return for the year ending October 2, 1970, Jack's Cookie Company ("Jack's") claimed a business expense deduction in the amount of $191,720.92 for cash disbursements made during that year under the terms of a written lease for an industrial building. The Internal Revenue Service disallowed $20,479.08 of the deduction, which had the result of reducing taxpayer's 1970 net operating loss and increasing by $9,829.96 Jack's tax liability for a prior year to which the 1970 loss had been carried back. Jack's paid the deficiency for the prior year, plus interest, and brought this action after a petition for a refund was denied. Upon stipulated facts and exhibits, the district court awarded summary judgment in favor of Jack's for the full amount of the deficiency and interest, holding that the partial disallowance of the deduction claimed by Jack's in 1970 was in error. The Government appeals, and we reverse.

## I

To finance the construction of a county-owned industrial building which Jack's Cookie Company agreed to lease for a term of 30 years, the County Court of Giles County, Tennessee, authorized two issues of interest-bearing bonds dated June 1, 1962, each in the principal amount of $1,250,000 and each to mature serially over the term of the lease. One issue consisted of "Industrial Building Revenue Bonds" ("revenue bonds"),[1] which are not general obligations of the county, the interest and principal being payable solely from revenues realized from the lease of the building. The other bonds, "Industrial Building Revenue and Tax Deficiency Bonds" ("tax deficiency bonds"),[2] are also retired from the rental income, but if proceeds under the lease should ever prove insufficient to meet the obligations to holders of these bonds, county tax levies are pledged to satisfy any deficiency. Repayment of both the revenue and tax deficiency bonds is ultimately se-

---

1. *See* The Industrial Building Revenue Bond Act of 1951, Tenn. Code Ann. §§ 6–1701 to 1716.

2. *See* The Industrial Building Bond Act of 1955, Tenn. Code Ann. §§ 6–2901 to 2916.

cured by a June, 1962, indenture of mortgage and deed of trust between Giles County and a Memphis bank which serves as trustee for the bondholders.

To ensure that proceeds from the lease are always adequate to promptly service the bonds, the written lease agreement between Giles County and Jack's requires that the lessee pay to the county "monthly rentals," beginning no later than June 1, 1964,[3] in an amount equal to

"One-sixth (⅙) of the next semi-annual interest due on each of said bond issued, [sic] plus * * * one-twelfth (1/12) of the next principal payment due on each of said bond issues, plus all necessary and reasonable expenses incurred by the Trustee and Paying Agent in the Administration of said bond issues * * *."

To these three sums, which are geared to the repayment of the bonds, the agreement adds a fourth amount due each month through the fifteenth year of the lease as "rent"; the lessee is required to make what are termed "reserve payments" in equal monthly installments sufficient to total $285,000 by the end of the fifteenth year. If Jack's fails to timely pay any part of its monthly rent, including the reserve payment, the county has the right to cancel the lease unless arrears are cured within a specified time.

Monthly rentals are payable to the trustee bank, which is required by the indenture of mortgage to use all except the reserve payments portion to pay principal and interest as they come due on both types of bonds and to cover expenses incurred by the bank as trustee.[4] Expressly different treatment is afforded the reserve payment element of each monthly installment. Reserve payments may not be used to routinely service the bonds; instead, they must be accumulated by the trustee and expended only as follows:

—if Jack's so directs, the trustee must invest reserve payments in obligations of the United States, returning any interest earned thereon to the reserve fund.

—if ever other monies are unavailable to pay interest and principal due on the revenue bonds, the trustee may use reserve funds for that purpose.[5]

—if, as it is entitled to do anytime after the fifteenth year of the lease, Jack's elects to prepay all its remaining rent obligations (in an amount equal to all unpaid principal and interest on all bonds, plus call premiums), the funds then in the reserve are to be credited against the amount due.

—if the rented premises are damaged or condemned, the lessee can opt not to have them reconstructed, in which case the lease will terminate upon prepayment of all remaining rental obligations, against which Jack's is to receive a credit for the funds then in the reserve.

All documents to which Jack's is a party are silent as to the disposition of the reserve funds in the unlikely event that any exist when the full term of the lease expires and all of the bonds have been retired.[6] However, language in a county court resolution which authorized the sale of revenue bonds suggests that the county might lay claim to any such surplus.[7]

---

**3.** The 30-year term of the lease began on June 1, 1962, but Jack's was required to pay no rent until the building was ready for occupancy or June 1, 1964, whichever came first. In the interim, a portion of the proceeds from the sale of bonds was used to pay interest to bondholders.

**4.** So long as Jack's is current in its rental payments, as it was throughout the period relevant to this case, the first three elements used to calculate each month's rent will, by definition, ensure sufficient revenues to meet these needs.

**5.** E. g., if Jack's defaults on its rent and if, while the default continues, interest or principal comes due on revenue bonds, then the trustee may dip into the reserves to satisfy the revenue bond holders.

**6.** At oral argument, it was agreed that, assuming Jack's occupies the building for the full term of the lease, the lessee would be "economically foolish" not to prepay its rent at some time in order to get the full benefit of any reserves as a credit against future rent.

**7.** Appendix at 99.

In the year ending October 2, 1970, Jack's made monthly rental payments totalling $191,720.92 pursuant to the lease provisions set forth above. As heretofore stated, the Internal Revenue Service disallowed as a deduction for current business rental expense $20,479.08 of that amount, which was the amount of the "reserve payments" made during that year. The Government's position is that taxpayer's obligation to pay rent under the lease boils down to an obligation only to retire the outstanding bonds. Because the reserve payments, unlike the rest of each month's rent, were not used or geared to satisfy any actual bond obligations during the tax year in question, and because at the taxpayer's election they can be applied to that end at some future time, e. g., as a credit in the event of prepayment of rent, it is asserted that these expenditures were capital in nature and that Jack's may deduct them, not as current expenses in the year they were paid to the trustee, but rather only when the reserve fund is actually consumed for the lessee's benefit. In support of this view the Government points to cases which hold that security deposits or advance rents which a lessee is required to pay the lessor are deductible as rent only in the year or years *for which* they are paid as rent and in which they are applied toward satisfying the lessee's actual rent obligations, not in the year *in which* they are paid unless that year is also one to which the payments or portions thereof are considered applicable as rent.[8]

Challenging the disallowance, taxpayer argues that even though the reserve payments might benefit Jack's by fulfilling certain provisions of the lease beyond the tax year in issue, the lessee had no choice but to make the monthly payments into the reserve if it was to enjoy continued use of the industrial building during the tax year; failure to do so would have allowed the county to cancel the lease. Thus, it is contended, the payments constituted ordinary and necessary business rental expenses deductible in the year paid under the plain language of Section 162(a)(3) of the Internal Revenue Code, 26 U.S.C. § 162(a)(3), which reads:

"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses *paid or incurred during the taxable year* in carrying on any trade or business, including—

\*    \*    \*    \*    \*    \*

(3) *rentals* or other payments required to be made as a condition to the continued use or possession, *for purposes of the trade or business, of property* to which the taxpayer has not taken or is not taking title or in which he has no equity."

(Emphasis added).[9] Moreover, deduction of the reserve element of the rent in the year paid would comport with the company's own treatment of the expense for internal accounting purposes, and since this treatment of the expense allegedly more clearly reflects the company's true income for the tax year than if deduction is deferred to a later year, Jack's maintains that deduction of the reserve installments in the year they are made is also sanctioned by the Code's tax accounting guidelines.[10] Taxpayer

---

8. Citing *Kohler-Campbell Corp. v. United States*, 298 F.2d 911, 913 (4 Cir. 1962); *Commissioner v. Boylston Market Ass'n.*, 131 F.2d 966 (1 Cir. 1942); *Galatoire Bros. v. Lines*, 23 F.2d 676 (5 Cir. 1928); *Smith v. Commissioner*, 51 T.C. 429, 440 (1968); *Minneapolis Security Building Corp. v. Commissioner*, 38 B.T.A. 1220 (1938).

9. The company, which insists that the expenditures in question were "rentals," disclaimed at oral argument any reliance upon the "or other payments" language of the statute. Also, neither party contends that Jack's has taken or is taking title to the leased premises, or that Jack's has any equity therein within the mean-

ing of Section 162(a)(3). Upon expiration of the 30-year term of the lease on August 1, 1992, taxpayer has the option to renew for three additional terms of 10 years each.

10. 26 U.S.C. § 446 provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books," but that "[i]f the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income."

urges that the deduction be allowed and that any benefit which might be derived from the reserve fund in the future, such as a credit against prepaid rent, be taxed as income to Jack's in the year such benefit accrues.

In awarding the company a refund of the tax it had paid on account of the disallowed deduction,[11] the district court reasoned that the mandatory nature of the reserve payments entitled the taxpayer to deduct them in the year they were paid to the trustee:

> "It seems to me that the government has the better of the decided cases, but the taxpayer has the advantage on the text of the statute and on the common sense of this particular case. The taxpayer had no part in creating the shape of the payments nor the timing of them. There is no way it can get the land without making the payments as required. The payments are made now and are a necessary current expense. The taxpayer gets the use of the land now, and thus receives the value of the payments now. There has been no conniving. The excess payments and the interest on those payments will be taxable to the taxpayer when the money is released from escrow."[12]

We are of the opinion, however, that the propriety and timing of the deduction are governed by considerations other than the mandatory nature of the reserve payments and that, applying those standards, the Government is entitled to summary judgment upon the undisputed facts as a matter of law.[13]

## II

In computing taxable income, a business is authorized by Section 162(a)(3) of the Internal Revenue Code to deduct "rentals" from its gross income. Although the term "rentals" is not defined in the statute, as early as 1925 the Supreme Court recognized that the word is to be taken in its "usual and ordinary sense" to mean "a fixed sum, or property amounting to a fixed sum, to be paid at stated times for the use of property." *Duffy v. Central R.R.,* 268 U.S. 55, 63, 45 S.Ct. 429, 431, 69 L.Ed. 846 (1925). This interpretation of "rentals," which has never been legislatively altered, has been consistently followed by the courts, although not without elaboration.

Notably, it has been firmly established as a result of litigation under § 162(a)(3) that, to qualify as a rental, a payment made to secure the use of business property must be "required" of the lessee, or, as put by one court, "wrung from [the lessee] by compulsion of circumstances delineated by law." *Utter-McKinley Mortuaries v. Commissioner,* 225 F.2d 870, 874 (9 Cir. 1955). As an essential attribute of rentals, the compulsion to pay is most often discussed in the context of contrived arrangements between lessors and lessees which have as their evident purpose the evasion of taxes,[14] but it is nevertheless a characteristic which, as a common sense matter, any claimed "rental" expenditure must possess if it is to be treated as such for purposes of an expense deduction. To hold otherwise would be to invite the deduction as rent of sums which are not truly paid "for the use of property,"

---

11. The district court had jurisdiction of this action under 28 U.S.C. § 1346(a)(1), and venue was properly laid in the Western District of North Carolina because taxpayer maintained its principal place of business in that district. 28 U.S.C. § 1402(a)(2).

12. *Jack's Cookie Company v. United States,* No. C–C–75–358 (W.D.N.C., June 3, 1977).

13. Like the plaintiff, the Government moved for summary judgment in the district court.

14. *E. g., Sparks Nugget, Inc. v. Commissioner,* 458 F.2d 631, 634 (9 Cir. 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1362, 35 L.Ed.2d 589 (1973); *Potter Electric Signal and Mfg. Co. v.*

*Commissioner,* 286 F.2d 200, 202–203 (8 Cir. 1961); *Kirschenmann v. Westover,* 225 F.2d 69 (9 Cir. 1955), *cert. denied,* 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744 (1955); *Smith v. United States,* 278 F.Supp. 230, 232 (S.D.Tex.1968); *E–Z Sew Enterprises, Inc. v. United States,* 260 F.Supp. 100, 118–119 (E.D.Mich.1966). There is no suggestion that the "reserve payments" provision of the lease between Jack's and the county was contrived. Indeed, the county may have been bound by state law to establish some sort of reserve in light of the issuance of revenue bonds. *See* Tenn. Code Ann. §§ 6–1704(4), 1715.

in contravention of the settled principle that statutes authorizing deductions from income for federal tax purposes are to be strictly construed. *See Koerner v. United States,* 550 F.2d 1362 (4 Cir. 1977), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). Thus, unless a taxpayer is under an obligation to compensate another in return for the use of property for business purposes, the disbursement is not a "rental" under § 162(a)(3).

The same is true of the "other payments" related to the lease of property for which deductions are authorized by this section of the Code—payments "*ejusdem generis* with 'rentals,' such as taxes, insurance, interest on mortgages, and the like, constituting liabilities of the lessor on account of the leased premises which the lessee has covenanted to pay." *Duffy v. Central R.R., supra,* 268 U.S. at 64, 45 S.Ct. at 431. In express terms, the statute allows a taxpayer to subtract such outlays in arriving at taxable income only if they are "required to be made as a condition to the continued use or possession" of the property.

But although an "obligation to pay" must exist before a business will be allowed to deduct a lease-related payment under § 162(a)(3), it does not follow that all expenditures which a business is compelled to make in order to secure the use of property constitute "rentals" or "other payments," or that those which facially qualify as such are deductible in the year paid. That a business is "required" to incur an expense to avoid cancellation of a lease, or as the court below stated, that "[t]here is no way [the taxpayer] can get the land without making the payments as required," goes only to the threshold factual question of whether the expenditure is of the sort contemplated by subsection (3) of § 162(a), and it is not dispositive of that issue, since there are other characteristics which a disbursement must have if it is to be treated as a "rental" or "other payment" within the meaning of the statute. Moreover, once it is determined that an expenditure *is* by nature a "rental" or "other payment," and the inquiry then turns to the matter of *when* a § 162(a)(3) deduction in that amount may

be taken, the fact that a taxpayer was "required" by the lease to pay the sum at a particular time is of less significance and does not of itself warrant allowance of the deduction in any particular year.

Not often advanced in explicit terms, these principles are plain from the face of the "decided cases" referred to in the opinion below. If it were true, for example, that by reason of their mandatory nature all payments extracted by contract as a condition to occupying another's property qualify as "rentals" or "other payments" under § 162(a)(3), then one would expect that a "security deposit" paid by a business as a prerequisite to possession of premises, and sums periodically paid to continue the possession, would be uniformly treated as such. Yet as the decision in *Minneapolis Security Building Corp. v. Commissioner,* 38 B.T.A. 1220, 1224 (1938), demonstrates, such status may be denied a security deposit which a business is "required" to pay at the outset of a lease, and the cases are legion which on various grounds have refused to treat as statutory "rentals" or "other payments," installments, though labelled "rent," remitted to the owner of property by a taxpayer business in fulfillment of the strict terms of a written lease. *E. g., Duffy v. Central R.R., supra,* 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846 (rejecting the argument that any payments under a lease, the failure to make which would entitle the landowner to terminate the possession of the property, constitute "rentals" under the statute); *Foyt v. United States,* 561 F.2d 599 (5 Cir. 1977) (monthly "rental payments" were in fact contributions to capital, not rentals); *M & W Gear Co. v. Commissioner,* 446 F.2d 841 (7 Cir. 1971) (claimed "rentals" held instead to be partial payments on purchase price); *West Virginia Northern R. Co. v. Commissioner,* 282 F.2d 63 (4 Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961) (sums designated "rentals" by lease were actually payments in satisfaction of personal debt). Obviously, something more than the compulsory nature of a disbursement determines whether or not it qualifies for deduction under the statute.

Similarly, a "requirement to pay" cannot explain the results in cases where the issue has been the *timing* of deductions for sums which *do* qualify as "rentals" or "other payments." Although incurred in each instance pursuant to contract, some costs of this kind—like the elements of plaintiff's rent which are defined in terms of principal, interest, and administration expenses—are commonly allowed as deductions in the year they fall due, while others, notably "advance" or "prepaid" rentals, are often allowed as deductions only in or over some later period.[15] For cases of the latter kind, *see* n. 8, *supra.* The only legitimate explanation for these differences is that the matter of when a deduction may be claimed under § 162(a)(3) is not determined solely on the basis of whether, under threat of penalty or dispossession, the lessee was bound to remunerate the lessor in a given amount on a certain date. The pertinent inquiry is of wider scope.

We conclude, therefore, that the brief rationale offered by the court below does not sustain the judgment on appeal. To qualify . for a current deduction under § 162(a)(3) of the Code, it is necessary, but not sufficient, that an outlay made during the tax year was "required" of the lessee as a condition to occupancy of the premises. While Jack's no doubt would have risked cancellation of the lease had it not timely forwarded the "reserve payment" portion of the monthly installments to the trustee, this circumstance satisfies only one element of the claim for relief, and is not, in itself, dispositive under either the taxpayer's or the Government's theory of the case.

## III

The question of whether Jack's was entitled to a current deduction for the "reserve element" of the monthly payments involves two closely related features of the revenue laws. First, the Code draws a distinction between various kinds of expenditures for the purpose of determining their tax treatment. Different statutory provisions, for example, govern the manner in which "trade or business expenses", on the one hand, and "capital expenditures", on the other, may be charged by the taxpayer against gross income. The initial inquiry concerns the nature of the cost incurred by the company; were the payments into the reserve fund trade or business expenses, were they capital in nature, or were they something else? Once the payments are so categorized, the focus shifts to the guidelines which specify whether, when, and in what amount disbursements of that kind may be reflected in the calculation of taxable income. The ultimate question is whether the applicable rules sanction, in the year they were incurred, a deduction in full for costs of the type in dispute.

Cast in these terms, the disagreement between the taxpayer and the Government involves only the first stage of the inquiry. The company argues that the reserve payments were "rentals", a species of the "trade or business expenses" made deductible by § 162(a),[16] while the Government

---

**15.** Advance rentals may be so treated regardless of whether the lessee reports deductions on an accrual or a cash basis. *Williamson v. Commissioner,* 37 T.C. 941, 943 (1962).

**16.** It is suggested in taxpayer's brief on appeal that if an expenditure meets the definition of "rental" for purposes of subsection (3) of § 162(a), then it need not also possess the characteristics of a "trade or business expense" under § 162(a) in order to constitute a deductible expense under § 162. *See* Brief of Appellee at 12, 17–18. However, the plain language of the statute refutes this argument, and we note that the courts have not observed this distinction. Deductions claimed for "rentals" often have been disallowed on the basis that the expenditures in question failed to pass muster under § 162(a). *See, e. g., Foyt v. United*

*States,* 561 F.2d 599 (5 Cir. 1977); *Perry v. United States,* 520 F.2d 235 (4 Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 782, 46 L.Ed.2d 641 (1976). Moreover, in recognizing and relying upon the notion that a sum must be "paid or incurred during the taxable year" in order to be treated as a "rental," Brief at 6, even the appellee acknowledges that § 162(a)(3) rentals must meet a requirement that is found only in § 162(a). Accordingly, we view the taxpayer's position to necessarily be that the reserve payments qualified as deductible expenses not only because they satisfied the specific conditions which any "rental" must meet under § 162(a)(3), but also because they met the basic tests of a § 162(a) trade or business expense, of which "rentals" are but one variety.

**402**

maintains that the expenditures were instead "capital in nature". Apart from this controversy as to the nature of the disbursements, neither party disputes the consequences which would follow if the opponent's characterization of the payments were to prevail. The Government concedes that if they truly were trade or business expenses within the meaning of § 162(a), then the reserve increments of the monthly outlays were deductible in the year paid and Jack's was entitled to the claimed deduction.[17] For its part, taxpayer acquiesces in the Government's position that if found to be "capital in nature", the expenditures were not deductible in the year paid, but rather may be used to reduce the company's taxable income, if at all, only in some later year or years when the reserve fund is actually applied in some manner beneficial to the taxpayer.[18]

The issue to be resolved is not an unfamiliar one for on prior occasions we have been called upon to determine into which category various expenditures should appropriately be placed.

**17.** 26 U.S.C. § 461(a) provides that a deduction for a § 162(a) trade or business expense "shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." The "method of accounting used in computing taxable income" is the method "on the basis of which the taxpayer regularly computes his income in keeping his books," unless the taxpayer's accounting method is challenged by the Secretary on the basis that it does not "clearly reflect income." 26 U.S.C. § 446(a), (b). *See* n. 10, *supra.* The Government admits that for internal accounting purposes, Jack's treats as current rent expense the full amount it paid under the lease, Brief of Appellant at 7, and, except on the ground that the reserve payments were "capital expenditures" not governed by § 461(a), the Government does not challenge under § 446(b) this treatment of the disbursements.

**18.** This treatment of the expenditures follows from the principle that "[c]apital expenditures * * * if deductible at all, must be amortized over the useful life of the asset," *Commissioner v. Tellier,* 383 U.S. 687, 689–690, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185 (1966), and is akin to the treatment afforded "advance rentals" which, once they are recognized as "capital expenditures," may be subtracted in arriving at taxable income only in the year or years in which they

**A**

Mindful that "[o]ur system of income taxation attempts to match income and expenses of the taxable year so as to tax only net income," in *Richmond Television Corp. v. United States,* 345 F.2d 901, 907 (4 Cir. 1965),[19] we embraced the "one-year" rule then followed by the Tenth Circuit, which treats an item as either a business expense, fully deductible in the year paid, or a capital expenditure, which is not, depending upon whether it secures for the taxpayer a business advantage which will be exhausted completely within the tax year.

"[A]n expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year, or if it secures a like advantage to the taxpayer which has a life of more than one year."

345 F.2d at 907.[20] In applying the rule in that case, we denied a current deduction for business expense to a taxpayer which had

are actually used to displace rental payments that the lessee would otherwise have to make during those periods under the lease. Although "an expenditure need not be for a capital asset, as described in Section 1221 of the Code, 26 U.S.C. § 1221, in order to be classified as a capital expenditure," *Georator Corp. v. United States,* 485 F.2d 283, 285 (4 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974), "the reason for disallowing the deduction of the entire payment or obligation in the taxable year is that there is no provision which permits deduction [of a capital expenditure] other than that which allows depreciation or amortization over the useful life of the asset acquired." 2 J. Mertens, Law of Federal Income Taxation § 12.24 (1974 Revision). *See* 26 U.S.C. § 167. Appellee's reliance upon 26 U.S.C. § 461(a) to avoid this result is misplaced, since § 461(a) does not govern the timing of deductions for disbursements of a capital nature.

**19.** *Vacated and remanded on other grounds,* 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965), *on remand,* 354 F.2d 410 (4 Cir. 1965).

**20.** Quoting *United States v. Akin,* 248 F.2d 742, 744 (10 Cir. 1957).

spent $25,000 to acquire a staff of trained employees from another corporation:

"A taxpayer may, therefore, not deduct as a current business expense the full cost of acquiring an asset, tangible or intangible, which benefits the taxpayer for more than one year. * * *

" * * * This was in all regards the acquisition of a capital asset whose value to the taxpayer would continue for many years, even though from time to time individual staff members could be expected to leave its employ."

The one-year concept surfaced again in *Darlington-Hartsville Coca-Cola Bottling Co. v. United States,* 393 F.2d 494 (4 Cir. 1968), *cert. denied,* 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968). There the taxpayer bottling companies deducted in one year, as an ordinary and necessary business expense under § 162(a), amounts they had paid the owner of a soft drink franchise to eliminate a middleman syrup distributor. Elimination of the middleman reduced the price of syrup to the bottlers, and there was every indication that the taxpayers would enjoy this more profitable arrangement in future years at no additional cost. Citing *Richmond Television,* the district court upheld the Commissioner's determination that the amounts spent to acquire the new syrup contracts were capital investments despite the fact that the contracts were not physical assets in the technical sense.[21] We adopted the opinion of the lower court with the observation that a capital expenditure is marked by "its intendment to produce a positive business benefit whose effects will be reaped in seasons beyond a single year." 393 F.2d at 496.

We last applied the one-year rule as an alternative ground for our decision in *Georator Corp. v. United States,* 485 F.2d 283 (4 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974). In *Georator,* which concerned the tax treatment of legal fees incurred by a corporation in successfully resisting the cancellation of a trademark registration, we stated that

"[o]ur analysis of this question begins with the principle of taxation reflected in Section 162(a) of the Internal Revenue Code that an expenditure securing benefits which are realized and exhausted in the same tax period is fully deductible in that tax period. Conversely, an expenditure securing benefits beyond the taxable year must be capitalized." [22]

485 F.2d at 284. Because "the benefits of successful opposition to the cancellation petition were likely to extend, and in fact did extend, beyond the tax period in which they were secured," 485 F.2d at 285, we concluded that the legal fees should be capitalized even though they were not among the expenditures expressly designated as capital assets in § 1221 of the Internal Revenue Code.

The taxpayer suggests that under our recent decision in *First National Bank of South Carolina v. United States,* 558 F.2d 721 (4 Cir. 1977) (per curiam), the one-year rule of our prior decisions has been replaced by a new test in this area. In making this argument the taxpayer points out that the opinion in that case makes no mention of the one-year rule and cites none of the foregoing cases. The Government, on the other hand, contends that the one-year principle survived *First Bank* and that, at most, the decision established only an alternative test which need not be applied in every case. In our opinion, *First Bank* did not abrogate the rule followed in our prior decisions, but merely refined and made explicit certain limitations which have always been inherent in its application.

At issue in *First Bank* was the tax status of assessments paid by a bank to a nonprofit association which was established by a number of banks to operate a computerized system for recording, authorizing, and billing the credit card transactions of their customers. The joint venture was undertaken to avoid duplication of costs and achieve economies of scale. As a member of the association, the taxpayer bank owned

---

**21.** *Darlington-Hartsville Coca-Cola Bottling Co. v. United States,* 273 F.Supp. 229 (D.S.C.1967).

**22.** Citing the *Darlington-Hartsville* and *Richmond Television* cases.

no stock, had no interest in the organization's assets, and was not entitled to any distribution of profits. Membership was non-transferrable, and upon dissolution, the assets of the association were to be paid over to a tax-exempt charity.

The assessments in question were all paid by the bank to cover expenses incurred in the association's formative state—salaries, office and equipment rental, general office expenses, advertising fees, and consultant's costs. Once operational, the association met expenses by charging each member bank a certain amount for each new credit card issued. Taxpayer sought to deduct the pre-operational assessments as an ordinary and necessary business expense under § 162(a), but the Commissioner disallowed the deduction on the theory that the payments were membership fees in the nature of capital expenditures because the benefit to the bank for which the assessments were incurred would extend indefinitely into future years.

Agreeing with the bank in its action for a refund, the district court noted, but did not rely upon, the one-year rule. Instead, it considered the facts of the case in the light of language from the Supreme Court's opinion in *Commissioner v. Lincoln Savings and Loan Association,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971):

> "[T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.
>
> "What is important and controlling, we feel, is that the § 404(d) payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here."

403 U.S. at 354, 91 S.Ct. at 1889, quoted in 413 F.Supp. 1107, 1111 (D.S.C.1976). Since the taxpayer's membership in the association was non-transferrable and, therefore,

of no intrinsic value, with the result that the bank had no salable asset from which it could recoup its assessments, the district judge concluded that the assessments could not be regarded as creating for the bank "anything remotely similar to the 'distinct and recognized property interest' which the Court in *Lincoln Savings* found that the taxpayer had acquired." *Id.*

On appeal, we affirmed on the opinion of the district judge and referred to the above quotation from *Lincoln Savings* as the standard by which capital expenditures are to be distinguished from ordinary expenses. 558 F.2d at 723. While our *per curiam* opinion omitted any reference to the one-year rule, it did describe as "indistinguishable from the case at bar" the case of *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10 Cir. 1974). There, in light of *Lincoln Savings,* the Tenth Circuit, from which we imported the one-year rule, observed that the rule "was intended to serve *as a mere guidepost* for the resolution of the ultimate issue, not as an absolute rule requiring the automatic capitalization of every expenditure providing the taxpayer with a benefit enduring for a period in excess of one year." 505 F.2d at 1192 (emphasis added).

This, we think, explains any facial conflict there may seem to be between *First Bank* and our earlier decisions. While the one-year concept has been the focal point of controversy and decision in several cases, the rule is not, in itself, talismanic and we have never so held. In the abstract many costs incurred by an on-going business can be viewed as producing some type of benefit beyond the taxable year, but we have never indicated that capitalization of an item is required on that basis alone. *First Bank* is a case in point. The bank's contribution helped to launch the association which, once established, rendered a cost-saving service to the bank in subsequent years; in this sense the pre-operational assessments would have a future impact. They, nonetheless, were deemed fully deductible in the year incurred.

But this is not to say that the potential of an expenditure to produce a business advantage over and beyond the tax year is irrelevant. To the contrary, unless an expenditure which would otherwise be treated as a Section 162(a) business expense results in benefits which are not realized and exhausted within the taxable year, its capitalization would be inappropriate in any event. A business cost must produce a benefit that will extend into future years if it is to be capitalized. Yet, that fact alone is insufficient to *require* such treatment. The one-year rule is useful because it serves to segregate from all business costs those which cannot possibly be considered capital in nature because of their transitory utility to the taxpayer. The rule, however, cannot be applied inexorably in the other direction.

It is apparent that the "separate assets" test of *Lincoln Savings,* which was followed in *First Bank,* necessarily incorporates the one-year rule and that in order to warrant capitalization of an expense, one integral characteristic of the "separate and distinct asset" which is "created or enhanced" by the outlay, is that it will serve the taxpayer in subsequent years.[23] Unquestionably the rule was refined by the language of *Lincoln Savings* which cautions that the "future benefit" aspect of capitalized costs should not be emphasized or applied to the exclusion of other essential features which it identifies generally as those possessed by "assets". In this light, the significance of our failure in *First Bank* to even mention the one-year rule is that its application was unnecessary because the assessments in issue were found to lack another characteristic of equal moment under the "separate assets" test, i. e., they did not create for the bank a property interest in anything of intrinsic or salable value.[24]

In the light of these underlying considerations, it is necessary to determine how the taxpayer's claim fares under the test of *Lincoln Savings.*

### B

Although Jack's had to pay the reserve element of its monthly rents to continue in possession of the property, and in that sense the payments were of current consequence to the company, there is no doubt that the disbursements also secured to the taxpayer benefits having a useful life which extended substantially beyond the close of the taxable year. This is clear from the indenture of mortgage, which requires that the trustee credit Jack's with the amount in the reserve fund in the event of prepayment of rent, and that the trustee return to the fund any interest earned on the investment of the reserves, thereby increasing the size of this credit. The taxpayer makes the point that Jack's might default on the lease or that other circumstances might arise to prevent Jack's from receiving the benefit of the reserve, but we do not see that this possibility requires treatment of the payments as § 162(a) expenses. A similar argument was advanced by the taxpayer in *Lincoln Savings,* but the Court rejected it with the observation that "this hazard exists with any routine investment in a bank or an insurance company and yet its presence does not make that investment an expense rather than a capital undertaking." 403 U.S. at 357, 91 S.Ct. at 1900.

Moreover, measured by the standard of *First Bank,* the fund into which the reserve element of the rents was paid was essentially a "separate and distinct asset" which

---

**23.** The expenditures which were found to be capital in nature in *Lincoln Savings* were of potential benefit to the taxpayer beyond the taxable year.

**24.** The district court in *First Bank* discerned no inconsistency between its disposition of that case and our decision in *Georator,* stating:

"* * * however, the Court [in *Georator*] assumed the existence of a definite asset, the trademark, and * * * [dismissed]

taxpayer's argument that its legal fees should not be capitalized because they only maintained and did not enhance the value of the trademark. *Georator* was correctly decided, but it is not inconsistent with the result in this case, where neither party can identify or define any asset upon which taxpayer's assessment expenditures have had any effect." *First Nat. Bank of South Carolina v. United States,* 413 F.Supp. 1107, 1112 (D.S.C.1976).

must be capitalized. As Plaintiff's Exhibit 4, App. 85, suggests, the reserve fund had an ascertainable and real value to the taxpayer in an amount equal to the sum of the reserve payments plus any investment income earned thereon. Together with the taxpayer's exclusive right to direct that the fund be invested and the fact that the reserve would redound to the benefit of Jack's if and when it chose to prepay rent, this establishes the requisite "property interest" in the account. Taxpayer would have us reach a contrary conclusion because in its view the reserve belonged exclusively to the county at the close of the tax year. This, however, ignores the power retained by the taxpayer to direct the trustee to invest the reserves, as well as the plain language of the indenture of mortgage which suggests that the fund will finally be paid out only upon the occurrence of the contingencies therein set forth.

In *Lincoln Savings* the Court found that the reserve account into which the payment flowed was essentially a separate asset because it was "available for only stated and circumscribed purposes", because it was "more permanent than temporary", and because the taxpayer had a "distinct and recognized property interest" therein (interest earned on FSLIC's investment of taxpayer's contributions was credited to taxpayer's share of the reserve). 403 U.S. at 355–356, 91 S.Ct. at 1899; the same can be said of the reserve into which the disputed portion of Jack's monthly installments was paid. There, as here, the reserve into which the taxpayer paid premiums was statutorily mandated, but the Court noted that "the fact that a payment is imposed compulsorily upon a taxpayer does not in and of itself make that payment an ordinary and necessary expense within the meaning of § 162(a) of the 1954 Code." 403 U.S. at 359, 91 S.Ct. at 1901. There, too, it was unlikely that the taxpayer would ever recover its payments, but the Court deemed this fact of little significance and found that the bank could nonetheless benefit from its expenditure in the future. 403 U.S. at 357, 91 S.Ct. 1893. There the taxpayer, like Jack's, interposed the annual accounting concept of the income tax as a factor which required that a current deduction be allowed, but the Court viewed that argument as having little bearing upon "the determination of whether an item is or is not an ordinary expense." 403 U.S. at 358, 91 S.Ct. at 1901. On balance, there is little of significance to distinguish the two cases, and we discern nothing in *Lincoln Savings* which would entitle Jack's to a current deduction.

Under the appropriate tests, we conclude that Jack's was not entitled to the deduction claimed by it under § 162(a). Accordingly, the judgment of the district court is reversed and the case is remanded for entry of judgment in favor of the Government.

*REVERSED* and *REMANDED*.