NCNB CORPORATION, a North Carolina Corporation; North Carolina National Bank, Appellees,

v.

UNITED STATES of America, Appellant.

No. 78–1771.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 3, 1979.

Decided June 18, 1981.

Aaron Rosenfeld, Tax Division, Dept. of Justice, Washington, D. C. (Gilbert E. Andrews, Jonathan S. Cohen, Tax Division, Dept. of Justice, M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., Harold M. Edward, U. S. Atty., Charlotte, N. C., on brief), for appellant.

E. Osborne Ayscue, Jr., Charlotte, N. C. (John W. Johnston, William H. Higgins, Helms, Mulliss & Johnston, Charlotte, N. C., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, WIDENER and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Here we encounter the distinction between those business-related expenditures which under I.R.C. § 162 may currently be set off against a taxpayer's gross income for the present accounting period (expensed) and those expenditures which must be carried forward on the taxpayer's books as part of the cost of producing income which will be recognized in future accounting periods (capitalized and subsequently written off, amortized, or depreciated).

## I.

The taxpayer[1] in the instant case is a "full service" national bank offering a wide range of banking services to its customers. To further its goal of providing banking services throughout North Carolina,[2] taxpayer has pursued for several years an expansion program involving over a dozen mergers with other banks, reconstruction of some of its existing facilities, and the establishment of new facilities ("branching"). Because taxpayer is a national bank, it must obtain the approval of the Comptroller of the Currency to establish a new branch or to retain and operate the existing branch of a bank with which it consolidates.[3]

Varied are the costs incurred in the many aspects of taxpayer's expansion program, ranging from selecting an area of the state for expansion, to planning future branches in that area, to turning such general plans into a concrete course of action, to obtaining the approval of the Comptroller of the Currency. (During the tax years in question, four of taxpayer's applications for approval were protested and were later approved only after an evidentiary hearing held by the Regional Administrator of the Office of the Comptroller. In one instance, the protest resulted in extensive litigation, in which taxpayer ultimately was successful.[4]) The costs involved in the expansion program were both internal (e. g., salaries, supplies, depreciation, amortization) and external (e. g., fees paid to the Comptroller, attorneys' fees, amounts paid to outside consultants for marketing studies).

As part of its long-range planning, the bank produced or purchased marketing studies of large metropolitan areas, reports which it called "Metro Studies." In addition to setting out long- and short-range recommendations regarding future branches, Metro Studies contained information which was used in planning future branches, data which were needed for applications to the Comptroller, and material which was relevant to action which might be taken in connection with existing branches. The District Court, in reaching its decision in taxpayer's favor on grounds independent of when anticipated revenues would match expenditures for Metro Studies, made no finding with respect to the useful life of the Metro Studies. Nevertheless, the record clearly implies that theirs was a multi-year utility, the value not being entirely restricted to nor exhausted within the single year of expenditure. Neither the parties nor the court made any allocation of that extended utility among (a) continued monitoring of the operations of existing branches, (b) planning for new branches, and (c) bringing those new branches into existence.

A second stage of planning produced what taxpayer calls "feasibility studies." The reports focused on specific locations for potential branches. To help management decide whether or not to open a new branch in the particular location, a feasibility study estimated additional income to be anticipated from a branch in the location, net of the further costs associated with opening a branch there. As with the Metro Studies, the court made no finding as to the duration of useful life.[5] Correspondingly, there was no finding as to whether the feasibility

---

1. Suits claiming income tax refunds were brought, for some tax years, by North Carolina National Bank (both on its own behalf and on behalf of a smaller bank merged into it) and, for later tax years, by NCNB Corporation, a one-bank holding company. Raising the same issues, the suits have been consolidated, and we regard them as involving a single taxpayer for the years 1965–1970.

2. North Carolina law permits state-wide branch banking. See N.C.Gen.Stat. § 53–62 (1975).

3. See 12 U.S.C. § 36 (1976).

4. See *First-Citizens Bank & Trust Co. v. Camp*, 409 F.2d 1086 (4th Cir. 1969).

5. Although the feasibility studies may have been of more transient value than a Metro Study, their utility in all probability persisted for at least several years after completion. If, upon remand, it should be determined that the expense of such a study was properly matched entirely against the year in which made, of course, deductibility in that single year, and not a spreading over several years, would be in order.

studies, in part at least, played any role in the production of current income.

In filing its corporate income tax returns for 1965–70, taxpayer treated all such planning and implementation costs as expenses currently deductible under I.R.C. § 162,[6] in the year incurred. That is, all expenditures connected with finding and selecting the best locations for future branches, with obtaining governmental permission to open branch banks in those locations, and with actually opening such branches, were charged against present income.

The Commissioner of Internal Revenue timely assessed a deficiency with respect to the returns. Because the costs of planning for, and of obtaining approval for, the branches were related to the production of the bank's future, rather than present, income, the Commissioner insisted that none of the expenditures were current expenses. Instead, he claimed that all the disputed costs had to be carried forward on the books of the bank, to be offset against income in some future period or periods as depreciation under I.R.C. § 167[7] or, when it subsequently became evident that no income would be generated, as a loss under I.R.C. § 165.[8]

The taxpayer paid in full the assessed deficiencies, it claimed refunds which the Commissioner denied, and it then timely sued for refunds in the District Court.

After a nonjury trial, the District Court entered judgment for the taxpayer, concluding that all the disputed expenditures were current expenses within the meaning of I.R.C. § 162. The court's decision was founded on the following conclusions of law: "The granting of permission to a bank to open a new branch does not create a separate and distinct asset. It produces nothing corporeal or salable. It does not create a capital asset within the meaning of the Internal Revenue Code of 1954." The Commissioner appealed.

We reject the Commissioner's flat contention that no current deductions at all could have been proper, but we also reject the District Court's conclusion that all of the expenditures at issue were currently deductible. It simply is not an all-or-nothing situation. Because the legal standards used by the District Court in reaching its decision were over-simple and incorrect, the court failed to make the necessary detailed factual findings which would permit allocation in whole or in part of certain costs between, on the one hand, the taxpayer's review of its current income-producing operations and, on the other, planning and implementing expansion for the production of income in subsequent tax years. Accordingly, we remand for further factfinding and for application of the proper legal standard.

## II.

In attempting to discern Congress' intent in enacting § 162(a), we can infer much from the role which the section plays in the income tax as a whole. Basically § 162(a) implements Congress' fundamental policy decision to tax net income calculated annually, with minimal distortion. To arrive at a figure for annual net income for a given tax year, it is necessary to reduce gross revenues *for the year* by the costs of producing *those revenues.*

---

6. I.R.C. § 162(a) provides in relevant part:
 § 162. Trade or business expenses
 (a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business
 . . . .

7. I.R.C. § 167(a) provides:
 § 167. Depreciation
 (a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear

(including a reasonable allowance for obsolescence)—
 (1) of property used in the trade or business, or
 (2) of property held for the production of income.

8. I.R.C. § 165(a) provides:
 § 165. Losses
 (a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Section 162(a)'s central statutory phrase "ordinary and necessary expenses," therefore, embodies two requirements: (1) business relation and (2) currency. *See Commissioner v. Tellier*, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 1119–20, 16 L.Ed.2d 185 (1966).[9] Although expenditures [10] which are "necessary" but not "ordinary" are no less business related than those which are both "ordinary and necessary," they may not be currently used in the calculation of net income. Such use must await tax years in which the taxpayer recognizes the gross revenues with whose production the expenditures are connected. It is that connection with some production of income which makes the expenditures "necessary" and which justifies the deduction in the first place.

Chief Judge Sobeloff said it well in *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965), *vacated on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965), *original holding on this issue reaffirmed*, 354 F.2d 410 (4th Cir. 1965):

> Our system of income taxation attempts to match income and expenses of the taxable year so as to tax only net income. A taxpayer may, therefore, not deduct as a current business expense the full cost of acquiring an asset, tangible or intangible, which benefits the taxpayer for more than one year. The concept has been explained in *United States v. Akin*, 248 F.2d 742, 744 (10th Cir. 1957).
>
> > '[A]n expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year, or if it secures a like advantage to the taxpayer which has a life of more than one year.'

The Commissioner concedes that the expenditures at issue in the instant case were adequately related to the taxpayer's trade or business (*i. e.*, were "necessary"). The question, therefore, is to what extent, if at all, the expenditures were also "ordinary," *i. e.*, were current, were part of the cost of producing the income which is reported on the disputed income tax returns. It is a matter of timing, the selection of the proper tax year or years against whose revenues the expenditures should be set off.

Obviously the question then becomes one of accounting.[11] Allocating an expenditure to a particular tax year or years involves an accounting judgment. By incorporating the "ordinary" requirement in § 162(a), Congress imposed on the courts a duty to make accounting judgments in evaluating disputes like the one before us.

The rule expressed by Judge Sobeloff requiring the matching of revenues and costs in the appropriate period, is, indeed, a basic concept of generally accepted accounting principles.

### A. Bookkeeping Mechanisms of Accounting

The basic elements of a statement of the instantaneous financial position of an enterprise, (of its balance sheet), are, of course: assets, liabilities, and owner's equity. "Assets" are both the "economic resources of an enterprise that are recognized and measured in conformity with generally accepted accounting principles ... [and] certain deferred charges that are not resources but that are recognized and measured in con-

9. "Our decisions have consistently construed the term 'necessary' as imposing only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's ] business' .... The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." 383 U.S. at 689–90, 86 S.Ct. at 1119–20.

10. As a term of art, "expense" (as distinguished from "expenditure") implies both the requirements of "ordinary and necessary." The portion of any "expenditure" which is properly allocable to the production of future revenues may not be an "expense" for the current period.

11. Generally accepted accounting methods are "ordinarily" a proper resort in determining tax treatment. *See* Treas.Reg. § 1.446–1(a)(2).

formity with generally accepted accounting principles." American Institute of Certified Public Accountants, *Accounting Principles Board Statement No. 4: Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises*, § 132 (1970) [hereinafter cited as *APB Statement 4*].[12] "Liabilities" are analogously defined as both economic obligations and certain deferred credits. "Owners' equity" is the excess of assets (including deferred charges) over liabilities (including deferred credits). *Id.*

The balance sheet summarizes an enterprise's position at a moment in time; the income statement summarizes the results of operations of the enterprise over a period of time.

Because noncash resources and obligations of enterprises change in time periods of different duration, or different beginning and ending dates than those in which a cash transaction may have been recorded, accurate reflection of income (and of financial position as well) "depends on measurement of economic resources and obligations and changes in them as the changes occur rather than simply on recording receipts and payments of money." *Id.* § 121. The consequent noncash method of measurement, known as "accrual," is one of the basic features of modern financial accounting.

Given the definitions for the balance sheet and income statement, the mechanism by which costs are allocated to particular accounting periods is quite simple to effect, even if selection of the proper period is difficult. If some of an expenditure currently paid may not properly be expensed in the current period, the asset "Cash" will be reduced, and the portion of the expenditure which should not be expensed in the current

period will result in the creation or increase of a separate, noncash asset in the balance sheet. In some later period, when the expenditure matures into an expense, the separate, noncash asset will be reduced by the amount to be expensed in that accounting period.

When the noncash asset is expensed systematically over a series of accounting periods, the process is called depreciation or amortization.[13] When an asset is expensed all at once, as when the balance of an expenditure earlier capitalized is removed from the enterprise's balance sheet, because the costs represented by the asset no longer provide discernible benefits to the enterprise, the process is colloquially called "writing off" or "taking a loss." [14]

■ As a matter of generally accepted accounting principles, the inclusion of "deferred charges" in the definition of "asset" now becomes clear. In order more accurately to reflect income, both in the present period and in future accounting periods, the carried-forward "assets" of an enterprise include, without regard to whether they are tangible or intangible, certain expenditures for benefits whose cost has already been incurred but the outlay for which is nevertheless most properly matched against some future period's revenues which the benefits will help produce. This matching is without regard to whether the benefits are tangible or intangible and also without regard to their realizability, through sale or otherwise. The critical factor is the accounting period in which the associated revenues are to. be recognized, not the nature of the benefits which help produce those revenues. Whether the deferred charge has some separate identifiable worth is irrelevant to the accounting process as it is applied.

12. *Cf. Commissioner v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 354, 91 S.Ct. 1893, 1899, 29 L.Ed.2d 519 (1971).

13. *See* I.R.C. § 167. By regulation, the Commissioner has attempted to restrict amortization of intangible assets to those cases where the asset's useful life in the business "can be estimated with reasonable accuracy." *See* Treas.Reg. § 1.167(a)–3.

14. *See* I.R.C. § 165; *cf. York v. Commissioner*, 261 F.2d 421 (4th Cir. 1958) (allowing deduction under the predecessor of § 162(a) for the cost of an expert survey of the industrial possibilities of land in which the taxpayer later decided not to invest).

■ The intimate relation between assets and future expenses has been stated by Professor Herwitz:

Actually any expense paid in advance creates an asset, although that asset may be short-lived . . . . By the same token, almost all assets are simply prepaid expenses, since ultimately they will be used up and disappear. . . . The amount of an advance payment which is used up during the period is an expense for that period; any portion of the payment not used up in the current period is something the business still owns, and hence is an asset as of the end of the period.[15]

Furthermore, an asset "whether tangible or intangible" can be seen as "the remaining balance of a previous cash outlay which has not yet been allocated to current expense because some of its usefulness remains to be consumed in the future.[16]

The operation of the bookkeeping mechanisms described above and their relevance in the resolution of tax questions are illustrated by the *Kauai Terminal* cases [17] and by *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974).

1. Kauai Terminal, Ltd., was engaged in transportation and warehousing, including lighterage to and from vessels, at Port Allen, Hawaii. Because a small breakwater which Kauai Terminal had built years before was inadequate to allow lighterage op-erations to continue during stormy weather, the company pressed the United States to build a breakwater which would allow year-round, all-weather lighterage to and from ocean-going vessels. The government eventually approved the project so long as local interests contributed $200,000 of the cost of the project. Kauai Terminal thereupon provided the entire local contribution and also deeded the existing breakwater to the United States.

The company attempted to deduct under the former version of § 162(a) the amount of its contribution to the government, the undepreciated construction cost of the existing breakwater, and certain planning and lobbying costs connected with its successful efforts to persuade the Army engineers to undertake the project. The Board of Tax Appeals upheld the Commissioner's assessment of a deficiency, because, although Kauai Terminal had no property interest in the new breakwater, the breakwater served the company's operations not only immediately but also indefinitely into the future. The cost of the breakwater, therefore, was not an "ordinary and necessary expense" to be deducted in a single year, but was required to be capitalized.

Two months before the extension of the breakwater was completed, the legislature of Hawaii decided to erect a new terminal and wharf in the breakwater's lee. Once the new wharf was completed four-and-a-

---

15. D. Herwitz, Materials on Accounting for Lawyers 21 (Temp. ed. 1978). *See* R. Dixon, S. Hepworth, & W. Paton, Essentials of Accounting 126–27 (1966):

All goods and services necessary to the operation of the enterprise enter the enterprise as assets, even though their service lives are of no more than an instant in length. As these goods and services are consumed in the production of net income, they relinquish their status as assets and become expenses of the period.

Ideally, all costs incurred, including charges for services received and consumed instantaneously, should be recorded initially by debit entries in asset accounts, and the amounts should then be transferred to expense accounts on the basis of accurate measurements of their consumption. Thus, the purchase of a tank of gasoline for a delivery truck represents the acquisition of an asset as of the moment of purchase, even though it will all be consumed in a day or two in making deliveries to customers. And the services of the truck driver are additions to assets as they are received, even though they become converted to expenses concurrently.

Provided that the principles expressed in the preceding paragraph are thoroughly understood and provided that adequate care is exercised in the measurement of asset expiration, the accounting entries may in some cases be condensed by treating highly transitory goods and services as expenses at the time of their initial recognition, thus bypassing their momentary classification as assets.

16. *Id.* at 180.

17. *Kauai Terminal, Ltd. v. Commissioner*, 36 B.T.A. 893 (1937); *Kauai Terminal, Ltd. v. Commissioner*, 47 B.T.A. 523 (1942).

half years later, Kauai Terminal was enabled to carry on its stevedoring, warehousing and other activities directly from the wharf, but its lighterage business was destroyed. The company's undepreciated cost of the physical properties used in its lighterage operations was, with the Commissioner's acquiescence, written off and deducted ratably over the period between the final decision to build the new wharf and the wharf's completion. The Commissioner objected, however, to attempts similarly to write off the now capitalized share of the cost of the government's new breakwater.

The Board of Tax Appeals noted that the new breakwater served not only the company's lighterage operations but also its business generally (by making possible the new wharf). Accordingly, a rough apportionment was made of the capitalized costs of the breakwater between the lighterage operations and Kauai Terminal's overall business. That portion allocable to lighterage was allowed to be written off. The writing off was to be done ratably during the period between the completion of the breakwater and the completion of the wharf, i. e., when the lighterage operations were enhanced by the breakwater and had not yet been destroyed by the wharf.

2. In *Commissioner v. Idaho Power Company, supra*, the Supreme Court had for consideration tax questions related to an electric utility which constructed a significant portion of its facilities with its own employees and equipment. It owned a wide variety of automotive transportation equipment such as trucks which were used both in the construction of new facilities and in the operation and maintenance of its existing plant. The automotive equipment had been capitalized when purchased by the company, and, if the equipment had been used solely in operation and maintenance, depreciation with respect to the equipment would have been routinely deductible under I.R.C. § 167.

*Idaho Power* contended that because the automotive equipment was used up and worn out just as surely by being used to construct new facilities as it would have

been by being used to service existing ones, the applicability of § 167 should not be affected. So long as the depreciable property was used in the company's trade or business, the argument went, it should make no difference whether the property was being used in the production of current revenues or in the construction of facilities for the production of future revenues.

The Commissioner, on the other hand, conceded that the language of § 167(a) applied literally to depreciation of the equipment used in the construction of new facilities, but he urged that the year's total depreciation for the automotive equipment be allocated nevertheless between current operations and the cost of construction of facilities with an enduring life. That part allocable to current operation the Commissioner admitted was presently deductible. But he insisted that the part which was allocable to the creation of a new facility had to be capitalized as part of the cost of the facility. At some future time, once the new facility should begin contributing to the production of revenues for Idaho Power, he argued, Idaho Power could begin taking depreciation deductions based on the total capitalized cost of the facility including its material costs, the wages of the construction workers, and the automotive-equipment depreciation at issue.

The Supreme Court agreed with the Commissioner. First, the Court noted that the purpose of depreciation accounting is to allocate the cost of using an asset to the various periods which are benefited by it:

When the asset is used to further the taxpayer's day-to-day business operations, the periods of benefit usually correlate with the production of income. Thus, to the extent that equipment is used in such operations, a current depreciation deduction is an appropriate offset to gross income currently produced. It is clear, however, that different principles are implicated when the consumption of the asset takes place in the construction of other assets that, in the future, will produce income themselves. In this latter situation, the cost represented by de-

preciation does not correlate with production of current income.

418 U.S. at 11, 94 S.Ct. at 2763. Thus, although the cost was presently incurred, it was related to the future and so had to be capitalized as part of the cost of the anticipated revenue stream from the new facilities.

### B. Generally Accepted Business Accounting Principles of Expense Recognition

Our discussion to this point has addressed the broader question of whether capitalization of an expenditure as an asset is proper, to carry it forward into an accounting period when it may properly be expensed. We now turn to the question of which period or periods are the proper ones in which to take the deferred expenditures into profit and loss, and correspondingly, to what extent, if any, some of an expenditure may be expensed in the current year. For that purpose, generally accepted accounting principles (GAAP) provide a hierarchy of expense recognition principles:

> To apply expense recognition principles, costs are analyzed to see whether they can be associated with revenue on the basis of cause and effect. If not, systematic and rational allocation is attempted. If neither cause and effect associations nor systematic and rational allocations can be made, costs are recognized as expenses in the period incurred or in which a loss is discerned.

*APB Statement No. 4, supra,* § 161.[18]

> Expenses are determined by applying the expense recognition principles on the basis of relationships between acquisition costs and either the independently determined revenue or accounting periods....
>
> From the perspective of income determination, costs are divided into (1) those that have "expired" and become expenses

---

**18.** To describe those three principles, *APB Statement No. 4* provides:

> § 157.... *Associating cause and effect.* Some costs are recognized as expenses on the basis of a presumed direct association with specific revenue.
>
> Although direct cause and effect relationships can seldom be conclusively demonstrated, many costs appear to be related to particular revenue and recognizing them as expenses accompanies recognition of the revenue. Examples of expenses that are recognized by associating cause and effect are sales commissions and costs of products sold or services provided.
>
> § 158. Several assumptions regarding relationships must be made to accumulate the costs of products sold or services provided.... "Attaching" costs ... often requires several allocations and reallocations of costs....
>
> § 159.... *Systematic and rational allocation.* In the absence of a direct means of associating cause and effect, some costs are associated with specific accounting periods as expenses on the basis of an attempt to allocate costs in a systematic and rational manner among the periods in which benefits are provided. If an asset provides benefits for several periods its cost is allocated to the periods in a systematic and rational manner in the absence of a more direct basis for associating cause and effect. The cost of an asset that provides benefits for only one period is recognized as an expense of that period (also a systematic and rational allocation). This form of expense recognition always involves assumptions about the pattern of ben-

efits and the relationship between costs and benefits because neither of these two factors can be conclusively demonstrated.... Examples of items that are recognized in a systematic and rational manner are depreciation of fixed assets, amortization of intangible assets, and allocation of rent and insurance. Systematic and rational allocation of costs may increase assets as product costs or as other asset costs rather than increase expenses immediately, for example, depreciation charged to inventory and costs on self-constructed assets. These costs are later recognized as expenses under the expense recognition principles.

> § 160.... *Immediate recognition.* Some costs are associated with the current accounting period as expenses because (1) costs incurred during the period provide no discernible future benefits, (2) costs recorded as assets in prior periods no longer provide discernible benefits or (3) allocating costs either on the basis of association with revenue or among several accounting periods is considered to serve no useful purpose.

Application of this principle of expense recognition results in charging many costs to expense in the period in which they are paid or liabilities to pay them accrue. Examples include officers' salaries, most selling costs, amounts paid to settle lawsuits, and costs of resources used in unsuccessful efforts. The principle of immediate recognition also requires that items carried as assets in prior periods that are discovered to have no discernible future benefit be charged to expense ....

and (2) those that are related to later periods and are carried forward as assets in the balance sheet.

*Id.* § 147.

### III.

■ Against generally accepted accounting principles and the pronouncements of the Supreme Court, which convincingly establish that full deduction in the year of expenditure was wrong, the taxpayer has advanced a number of arguments, none of which, however, justify the claimed right to deduct 100% of expenditures in the year made, even though they have multi-year life, and indisputably, in part at least, relate to future income. The arguments may be divided for convenience into two groups. One group urges the acceptability for tax purposes of a coherent accounting system which is substantially different from generally accepted principles. The second group suggests that § 162(a)'s scope should be determined not by the application of a broad accounting principle of matching revenues with the costs of their production but by reference to one or more claimed departures supposedly embodied in a series of verbalisms, talismans, and rules-of-thumb which have on occasion been alluded to by other courts who were faced with cases involving § 162(a).

### A. *Other Accounting Systems*

1. There are, it is true, some situations in which tax accounting principles of expense recognition differ from generally accepted accounting principles.[19]

a. The most significant exception to application of generally accepted accounting principles, however, is one which offers taxpayer no comfort. Under I.R.C. § 446(b) substantial discretion vests in the Secretary of the Treasury or his delegate to determine whether a taxpayer's system of accounting does or does not "clearly reflect income."[20] While the Commissioner, therefore, may, in an appropriate situation, for tax purposes, authorize a departure from generally accepted accounting standards, especially if the departure enhances a more exact computation of income, in the instant case, the Commissioner has insisted on accounting standards in accord with the generally accepted accounting principles described above. What he calls for will more clearly reflect income than will the technique of immediate 100% expensing sought to be employed by the taxpayer. So we are confronted with a test of the scope not of the Commissioner's discretion to deviate from generally accepted accounting principles but of his right to insist on them.

b. Our attention has been directed to several instances in income tax law in which taxpayers are allowed currently to recognize some expenses even though theoretical nicety would suggest capitalization and subsequent recognition. They may be called the "more-trouble-than-it's-worth exceptions."[21] None of them apply to the instant case and none of them is analogous enough to the situation in the present case to warrant its extension.

---

**19.** *See, e. g., American Automobile Ass'n v. United States,* 367 U.S. 687, 693, 81 S.Ct. 1727, 1730, 6 L.Ed.2d 1109 (1961).

**20.** *See, e. g., Schlude v. Commissioner,* 372 U.S. 128, 133, 83 S.Ct. 601, 604, 9 L.Ed.2d 633 (1963).

**21.** For example, where an expenditure will take no more than a year to generate the matching income, it may nevertheless apply partly in the current year, partly in the next. Theoretically, the part attributable to the latter year should be capitalized. However, the tax treatment will then vary between taxpayers depending on the time of year when the expenditure is made. He who pays in January would usually have a tax advantage over him who pays later in the year. Since income distortion is unlikely to be great, as a recognition of greater simplicity and convenience for all, a slight deviation from completely accurate accounting principles is permitted and capitalization is not required. For an illuminating discussion of the one year rule, see *Jack's Cookie Co. v. United States,* 597 F.2d 395, 402–405 (4th Cir. 1979), *cert. denied,* 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979). As with other rules in this rough terrain, the rule is not absolute, and may give way if sufficient countervailing considerations are marshalled. *Id.* at 404: "While the one-year concept has been the focal point of controversy and decision in several cases, the rule is not, in itself, talismanic and we have never so held."

2. Taxpayer also directs our attention to the method of accounting on the basis of which it regularly keeps its books—a method of accounting required of all National Banks by the Comptroller of the Currency. Under that method, according to the taxpayer, all expenditures relating to the development and expansion of banking services—including the expenditures at issue in this case—must be charged to expense in the accounting period when incurred.

■ The "general rule" is that taxable income should be computed under the method of accounting on the basis of which taxpayers regularly compute their income in keeping their books. *See* I.R.C. § 446(a). This is especially true when the regularly used accounting method is prescribed by regulatory authorities. *See Commissioner v. Idaho Power Co.*, 418 U.S. at 15, 94 S.Ct. at 2765: "Although agency-imposed compulsory accounting practices do not necessarily dictate tax consequences, . . . they are not irrelevant and may be accorded some significance."

The overriding critical determination remains to be made, however, as to whether the accounting practice in question clearly reflects income. Subsection 446(b) of the I.R.C. places that determination largely within the discretion of the Secretary of the Treasury or his delegate (the Commissioner), and the Supreme Court has held that the Commissioner's discretion includes power to reject even some methods of accounting that are in accordance with generally accepted accounting procedures.[22] The question before us, therefore, is whether the Commissioner has abused his discretion in rejecting taxpayer's regularly used method of accounting as one which "does not clearly reflect income."

Many decades ago, when accounting was still primarily on a cash basis, the most important financial statement was the balance sheet, which was used by potential investors in, or creditors of, an enterprise in part to estimate the proceeds which would be available in case of a forced liquidation.[23] Out of fairness to investors and creditors, conservative practice required great restraint in deferring the recognition as an expense of any expenditure for an intangible which did not result in some increase in the break-up, liquidation value of the entity. Because present-day investors and creditors, however, tend to focus more on an enterprise's earning power than on its liquidation value, the income statement has supplanted the balance sheet as the most important of an entity's financial statements.[24] According to Professor Thompson:

> [The] shifts from cash accounting to accrual accounting and from the Balance Sheet to the Income Statement as a basis for decision-making have given greater impetus to: (1) the practice of matching costs with revenues; (2) the acceptability and desirability of deferring charges to accomplish this matching; and (3) similarity in accounting for tangible and intangible assets.[25]

"Accounting principles that are deemed to increase the usefulness of the income statement are therefore sometimes adopted by the profession as a whole regardless of their effect on the balance sheet or other financial statements." *APB Statement 4, supra,* § 172.

Even today, however, some special-purpose business or regulatory accounting systems may adopt procedures to reduce the carrying figures for certain intangible assets even if that reduction effects a distortion of reported income. In the area of banking, liquidity requirements remain a major tool in protecting the investing public. Regulators, therefore, tend to give the balance sheet of a bank great weight and to

---

**22.** *See, e. g., American Automobile Ass'n v. United States,* 367 U.S. 687, 693, 81 S.Ct. 1727, 1730, 6 L.Ed.2d 1109 (1961); *Schlude v. Commissioner,* 372 U.S. 128, 133, 83 S.Ct. 601, 604, 9 L.Ed.2d 633 (1963).

**23.** *See* D. Herwitz, *supra,* at 180.

**24.** *See APB Statement No. 4, supra,* § 172.

**25.** G. Thompson, R. Whitman, E. Phillips, & W. Warren, *Accounting and the Law* 327 (4th ed. 1978).

require methods of accounting in which book values on the balance sheet represent resources which the bank, with a reasonable degree of certainty, would be able to mobilize in case of difficulties. Minimizing the values carried forward on the left side of a balance sheet may in some instances, however, also diminish reported net income so that the report fails clearly to reflect income. But because of the importance of investor protection and of the role of a conservative balance sheet in that protection, bank regulators may quite properly relegate accuracy of the bank's periodic income statements to a position of secondary significance.

The Comptroller wanted an ultra-conservative, a distorted balance sheet, concentrating on liquidatable assets and understating deferred charges.[26] The Comptroller has, of course, a special duty to perform: the enhancement of liquidity and solvency of the banks under his jurisdiction.

■ The Commissioner, on the other hand, serves a different public purpose and is required by Congress to give primary significance to accuracy of income. In doing so, he rejected the Comptroller's balance-sheet-oriented accounting as providing insufficient matching of revenues with the expenditures which produce those revenues. Particularly in light of the *differing* goals of the two accounting systems, we hold that

the Commissioner did not abuse his discretion in determining that taxpayer's regular system of accounting "does not clearly reflect income" within the meaning of I.R.C. § 446(b).[27] The Bank may not, for tax purposes, understate its income by overstating its expenses, even though the Comptroller of the Currency has required for other purposes that it do just that.

B. *Verbalisms, Talismans, and Rules-of-Thumb*

■ In addition to arguing for a special-purpose accounting system, taxpayer contends that—regardless of accounting principles—a current deduction must be allowed for any expenditure which does not produce a "capital asset" as defined by I.R.C. § 1221, which does not relate to a new trade or business, and which does not procure for taxpayer some independent property interest. The argument runs that, without at least one of these properties, it may not be capitalized, but must be expensed. Although any one or more of three factors when present may be *sufficient* to require that an expenditure be capitalized, none of them, individually or together, must *necessarily* be present to make capitalization appropriate.[28] Even in their absence, if an expenditure is part of the cost of producing future rather than current income, expensing the expenditure when incurred will not "clearly reflect income," and a deduction

**26.** There is a suggestion that the Comptroller's particular accounting requirement at issue is designed not to effect a liquidity requirement but to prevent a bank's expansion program from triggering an increase in the resources which must be dedicated to meeting the liquidity requirement. Whether expensing all expenditures which are related to the development and expansion of banking services is a means of furthering a liquidity requirement or whether such expensing is a means of partially avoiding some of the rigors of such a requirement, the Comptroller's decision appears dictated by special balance-sheet considerations growing out of particular regulatory concerns rather than by accuracy in income-statement which is a goal of generally accepted accounting principles and of the Commissioner's efforts to have income clearly reflected. It is on generally accepted principles enhancing accuracy of income computation that we should concentrate for income tax accounting purposes.

**27.** Here the Comptroller's accounting requirement eroded the clear reflection of income. The accounting requirement by a regulatory agency is controlling if: "a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method clearly reflects income ...." *Commissioner v. Idaho Power Co.*, 418 U.S. at 15, 94 S.Ct. at 2765 (emphasis in original).

**28.** *See* Judge Field's reliance on the *distinction* between "necessary" and "sufficient". *Jack's Cookie Co. v. United States*, 597 F.2d 395, 401 (4th Cir. 1979), *cert. denied*, 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979).

may be barred by the Commissioner. I.R.C. § 446(b).

### 1. "Capital asset"

The statutory definition of "capital asset" excludes both real property used in a trade or business and depreciable property used in a trade or business. *See* I.R.C. § 1221(2). Thus if only "capital assets" as defined in that section may be capitalized, taxpayers would be entitled to a current deduction for the purchase of land, and they would not have to depreciate a building or long-lived factory equipment, but rather could write it all off in the year acquired. The authorities have unequivocally rejected the notion that the Commissioner may require capitalization only of property which meets the I.R.C. § 1221 definition of "capital asset." *See Georator Corp. v. United States*, 485 F.2d 283, 285 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974) ("It is clear that an expenditure need not be for a capital asset, as described in Section 1221 of the Code, 26 U.S.C. § 1221, in order to be classified as a capital expenditure."). *Accord, Jack's Cookie Co. v. United States*, 597 F.2d 395, 402 n.18 (4th Cir.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979). *United States v. Mississippi Chemical Corp.*, 405 U.S. 298, 310, 92 S.Ct. 908, 915, 31 L.Ed.2d 217 (1972), suggested that status as a long-lived "capital asset" is *sufficient* to require capitalization, but it nowhere intimated that such status might also be *necessary*.

 It is, therefore, not proper to accelerate deduction of expenditures matching income for several years simply on the grounds that they produced no "capital asset."

### 2. New Business/Old Business

The taxpayer puts forth the similar argument that, as to some of the claimed deductions at issue, even if expenditures to start a new business require capitalization, still the expenditures restricted to the enterprise's old business, even though to be conducted perhaps in a new way, should be expensed. The taxpayer suggests that the rule contended for is exemplified by *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), *vacated on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965) (per curiam), *original holding on this issue reaffirmed*, 354 F.2d 410 (4th Cir. 1965), in which we, however, required a television station to capitalize the costs of training its staff during tax years before the station began to receive revenues from broadcasting. The fact that the business was new was not the rationale, insofar as the portion of the opinion applicable here is concerned. Rather the case was decided on the ground that the expenditure related to a future period or periods, not to the current one.

When the costs at issue relate to a new business, income will almost certainly be <u>un</u> clearly reflected if those costs are set off against revenues flowing from the enterprise's old business.

Where the expenditure relates to the enterprise's old business, it may or may not be appropriate to consider the expenditure as part of the cost of producing current revenues.[29] In some situations there may be a clear cause-and-effect relation between the expenditure on the old business and a future revenue stream which has not yet begun to flow. If so, carrying forward and capitalizing the costs is appropriate.[30] In

---

**29.** In *Darlington-Hartsville Coca-Cola Bottling Co. v. United States*, 393 F.2d 494 (4th Cir. 1968), *cert. denied*, 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968), taxpayers were bottlers of Coca-Cola who had been forced to buy Coca-Cola syrup from a middleman holding exclusive rights from the Coca-Cola Company in specified areas of South Carolina. Under a negotiated plan, the Coca-Cola Company purchased the stock of the middleman, liquidated that company, and agreed to provide Coca-Cola syrup to the taxpayers at a price no higher than that which Coca-Cola had been charging to the middleman. The taxpayers reimbursed Coca-Cola for the stock acquisition. We held that the amounts of reimbursement had to be carried forward and could not be currently deducted, notwithstanding that the taxpayers were engaged after the transaction in the same old business as before and with the same customers.

**30.** *APB Statement 4, supra*, §§ 157–158.

other situations, "no useful purpose" [31] would be served by allocating the costs to a subsequent period, or the costs "cannot, as a practical matter, be associated with any other .[than the current] period." [32] If so they should be charged to current expense. But in the present case, a useful purpose will be served, and it is altogether practical to require capitalization where the correlative income is not current.

▇▇▇▇ Just as all or part of an expenditure on new business may be current and deductible if the business has operated during part of the current year, so too all or part of an expenditure on old business may have to be capitalized as related to anticipated future income. It is the current or future nature of the matching income, not the newness or non-newness of the business which controls. The test is simply not one of whether the business is an old or a new enterprise. Relation to a new business of the enterprise in question is thus a *sufficient* but it is not a *necessary* condition for carrying a cost forward to subsequent accounting periods.

### 3. Property interest

A similar analysis applies to the suggestion that an enterprise should carry forward even those costs lasting for more than a year only when they are associated with property interests. Where such an expenditure is in fact so associated, an appropriate part of it *must* be carried forward. That is the holding of *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 354, 91 S.Ct. 1893, 1899, 29 L.Ed.2d 519 (1971)

(presence of such an interest called "controlling"). The case did not suggest a need for the presence of a property interest (or, *a fortiori*, for the presence of corporeality or salability or realizable value) before capitalization may be required. That one was there made the result all the more obvious. But the case does not hold that, in the absence of a property interest, the opposite result was compelled. Nor did the case cast the slightest doubt on the continued validity of *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

In *Welch*, the former officer of a bankrupt corporation paid off many of the discharged debts of the defunct corporation in order to solidify his own credit and standing in his current profession. The Supreme Court conceded that the money may have been "well and wisely spent," 290 U.S. at 116, 54 S.Ct. at 9, that is, that it was "necessary." But the Court upheld the Commissioner's determination "that the payments in controversy came closer to capital outlays" than to current expenses, *id.* at 115, 54 S.Ct. at 9, and thus that they were not "ordinary." Accordingly, although no property interest was involved, the expenditures were not currently deductible and instead had to be capitalized. The opinion recognized that the favorable reputation resulting from the expenditures was "akin" to capital assets, an acknowledgement that it was not a capital asset. If not, *a fortiori*, it was not a property interest. The *Kauai Terminal* cases stand for the same principle. [33]

---

31. *Id.* § 160.

32. *Id.* § 155.

33. Like *Kauai Terminal*, numerous cases have required taxpayers to carry forward the costs of contributions to third parties where the taxpayer received no expectation of long-term benefit from the use to which the third party was to put the contribution but where the taxpayer received no property or contract rights in the subject matter of the contribution. *See, e. g., Chicago & N. W. Ry. v. Commissioner*, 114 F.2d 882 (7th Cir. 1940) (taxpayer required to carry forward value of land adjacent to railroad right of way when the land was given to a municipality in part for a public street, because

taxpayer received the long-lasting general benefit of greater accessibility to city streets, a decrease in the cost of crossing protection, and a permanent protection of its right of way against the danger of floods); *Colony Coal & Coke Corp. v. Commissioner*, 52 F.2d 923 (4th Cir. 1931) (per curiam) (taxpayer required to capitalize the amount paid to a railroad to build a branch line to taxpayer's properties, notwithstanding that the railroad owned the tracks and that the contract between the taxpayer and railroad specified no minimum time during which the connection and associated service were to be maintained); *Gauley Mountain Coal Co. v. Commissioner*, 23 F.2d 574 (4th Cir.

Association with a property interest that lasts for more than a year, therefore, has always been and continues to be a *sufficient* but not a *necessary* condition for carrying a cost forward.[34]

We are unpersuaded by contrary language in some recent cases in other circuits which implicitly assumed that *Lincoln Savings and Loan* overruled *Welch sub silentio.* To the contrary, in fact, *Lincoln Savings and Loan* cited *Welch* and quoted from it. *See* 403 U.S. 352–53, 91 S.Ct. at 1898. *Lincoln Savings and Loan* nowhere suggested that *Welch* was wrongly decided, notwithstanding that the *Welch* taxpayer's credit and professional standing were not property rights, much less corporeal and salable interests.

In *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775 (2d Cir. 1973), the Loft Candy Corp. had previously relied on sales through its own retail stores, but the profitability of those stores had been greatly reduced as a result of a population shift of people from urban centers to the suburbs. Loft's, therefore, expended substantial sums in setting up a separate "franchise" division and in securing multi-year contracts with independently operated suburban retail outlets which agreed to carry Loft's candies. Suggesting that the relevant tax law was unclear,[35] the Second Circuit reversed the Tax Court, which had upheld the Commissioner's determination that the expenditures in question should have been carried forward into, and the associated outlays should have been spread over, tax years in which Loft's received the revenues from sales by the independent retail outlets.

*Briarcliff Candy* is distinguishable from the instant case in that the reduced profitability of Loft's own retail stores may have

1928) (same, in context where the landowner, seeking a depreciation allowance, argued in favor of capitalization and the Commissioner argued against); *Oswego Falls Corp. v. Commissioner*, 46 B.T.A. 801 (1942) (taxpayer required to carry forward cost of contribution for refurbishing private luncheon and dinner club which was frequently used by taxpayer's employees to entertain taxpayer's out-of-town guests); *Scovill Mfg. Co. v. Commissioner*, 25 B.T.A. 265 (1932) (taxpayer required to carry forward costs of reconstructing a dam owned by a corporation of which taxpayer was a significant minority shareholder, where reconstruction of the dam provided taxpayer with adequate water to undertake 24-hour per day operations).

**34.** The cost of eliminating competition must be carried forward even when a taxpayer obtains no legal right to keep the defeated competitor out of the market. *See, e. g., Houston Natural Gas Corp. v. Commissioner*, 90 F.2d 814, 816 (4th Cir. 1937) ("[T]he cost of eliminating competition is a capital asset . . . ."); 4A J. Mertens, The Law of Federal Income Taxation § 25.37 (1979) ("Payments made to suppress competition or to secure agreements not to compete . . . are not deductible as business expenses primarily for the reason that the benefits . . . have a life extending beyond the taxable year . . . .").

Similarly, taxpayers may not deduct under § 162 certain long-lived business promotion expenditures. *See, e. g., Durovic v. Commissioner*, 542 F.2d 1328, 1334 (7th Cir. 1976) (ampules of medicine distributed free of charge to physicians); *Fall River Gas Appliance Co. v. Com-* *missioner*, 349 F.2d 515 (1st Cir. 1965) (gas company not allowed to deduct under § 162 the cost of installation of gas appliances leased from it, where company expected to derive profits over many years from the sale of gas to the lessees, notwithstanding that no initial lease was for more than a year, that some of the appliances were removable at the will of the customer on twenty-four hour notice, and that the labor costs on removal prevented recoupment of any appreciable amount of the original installation cost by way of salvage).

**35.** *See* 475 F.2d at 783, 785:

[I]t is incumbent on the legislative authorities making the statutes and the implementing regulations to furnish clear standards and guidelines as to what intangible assets are deductible under § 162 and what are not.

At present it is anybody's guess. . . .

. . . .

If further elucidation were possible it would certainly be welcome.

. . . .

In the realm of intangibles, . . . the rulings and decisions are in a state of hopeless confusion particularly where the issue concerns an intangible contribution (such as a salesman's work-product) to an intangible asset (such as his company's position in the market). . . . The taxpayer . . . is entitled to reasonably clear criteria or standards to let him know what his rights and duties are. As matters now stand, . . .

This kind can come forth by nothing but by prayer and fasting.

constituted damage to its goodwill for which no loss allowance had been made and which was merely being repaired by the expenditures at issue in the case. *See* 475 F.2d at 787. But even if *Briarcliff Candy* were indistinguishable, we cannot accept much of its language and reasoning.

■ Stressing that Loft's continued to sell "exactly the same products it had sold for decades," 475 F.2d at 783, the court noted that if, *during the period covered by the "franchise" contract,* Loft's had instead rented space in the independently owned retail outlets or if it had relied on commission salesmen to promote its products, the rentals or the commissions for future years would have been payable and deductible *in the later tax years.* From a correct statement that *hypothetical* expenditures would be deductible during the years when the associated revenues were recognized, the court went on to a *non-sequitur* that the *actual* expenditures producing analogous benefits for Loft's were deductible not when the associated revenues were recognized but when the expenditures were incurred. We respectfully disagree and believe that when the timing of a deduction is at issue, deductibility of an analogous expenditure in *later* tax years suggests <u>non</u> deductibiity in the current year.

Except for the unfounded assertion that *Lincoln Savings and Loan* had *sub silentio* "brought about a radical shift in emphasis" in construing § 162(a), 475 F.2d at 782, the *Briarcliff Candy* opinion offers no support for its conclusion that, with respect to intangibles, taxpayers may be required to carry forward only "items of ownership of a permanent or fixed nature which are convertible into cash." *Id.* at 786. *Contra, Welch v. Helvering,* 290 U.S. at 115–116, 54 S.Ct. at 9. Since the Supreme Court has indicated not the slightest doubt about the continued validity of *Welch,* we must respectfully disagree with the Second Circuit.

In *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974), the court relied heavily on *Briarcliff Candy* and allowed a current deduction un-

der § 162(a) for all of a taxpayer's preoperational expenditures in connection with beginning participation in a national credit card system. Although the expenditures were of a sort which would frequently recur (thus suggesting that any benefits obtained had a determinable useful life) and although the taxpayer had recognized some revenues from the credit card program during the tax year in question, the Commissioner suggested to the court no way in which the expenditures might be amortized, and thus deductible partially in that tax year, nor, indeed, did he suggest that they might ever be deductible. *Id.* at 1192. Rejecting a scheme under which "an expenditure, *concededly of temporal value,* may be neither expensed nor amortized," the court allowed the current-expense deduction. *Id.* (emphasis added). "The government suggests no way in which they could be amortized." It was, in short, an attempted overreaching by the tax collector. If he failed, he had less basis for protest than if he had confined his demands to those which were properly Caesar's.

In connection with multi-year intangible benefits, however, the Commissioner generally allows amortization to begin once the remaining useful life of the asset in question can be estimated with reasonable accuracy. *See* Treas.Reg. § 1.167(a)–3. The taxpayer in the instant case is, therefore, not faced with the Catch–22 from which the Tenth Circuit believed that it had to rescue Colorado Springs National Bank.

Relying as it did on *Briarcliff Candy,* the opinion in *Colorado Springs* contained some language which implicitly rejects *Welch v. Helvering:* "The start-up expenditures here challenged did not create a property interest. They produced nothing corporeal or salable.... At the most they introduced a more efficient method of conducting an old business." 505 F.2d at 1192. Since the Supreme Court's decision in *Welch* remains good law, we must respectfully choose not to be governed by inconsistent language from the Tenth Circuit.[36]

---

**36.** The same must be said of the decision in *First Security Bank of Idaho v. Commissioner,*

592 F.2d 1050 (9th Cir. 1979), in which the court was faced with a factual situation which

For half a century, this court has required the Commissioner and taxpayers to match expenditures with the revenues which those expenditures help produce, a requirement which has conveniently (if somewhat imprecisely) sometimes been summarized with versions of the future-benefit rule.[37] Although we ruled for a taxpayer in *First National Bank of South Carolina v. United States*, 558 F.2d 721 (4th Cir. 1977) (per curiam), we nowhere suggested that we intended to depart from our long-standing principle of matching revenues with the costs of their production.

Since the facts in *First Bank* were very similar to those in *Colorado Springs*, the taxpayer in the instant case argues that unless we had rejected the matching principle, *First Bank* would have been wrongly decided. Whatever the correctness of the *First Bank* result, we would not have jettisoned five decades of precedent without clearly and explicitly saying that we were doing so. Thus, it is not fitting to decide the instant case on an erroneous assumption that *First Bank* abandoned *sub silentio* a principle which has long played a central role in our decisions and whose overriding importance was recently reaffirmed by the Supreme Court in *Commissioner v. Idaho Power Co.*, 418 U.S. at 1, 94 S.Ct. at 2757. There is too much order and coherence in the tax law of this Circuit for us to treat it as whimsically as taxpayer wishes.

Subsequent to the decision in *First Bank*, we decided *Jack's Cookie Co. v. United States*, 597 F.2d 395 (4th Cir. 1979), *cert. denied*, 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979) in favor of the government and contrary to the taxpayer on the very issue of whether the expenditure could be expensed or had to be capitalized. The Court in *Jack's Cookie* distinguished *First Bank* on a number of grounds, pointing out that it was not applicable to *Jack's Cookie* in any event, since *Jack's Cookie* involved creation of a separate and distinct asset. Recognized as a factor utilized to distinguish another case, the statement cannot be taken as endorsement for the proposition that to capitalize there must be a separate and distinct asset.

As for the property-interest rule, the treatment of the need for a property interest, separate and distinct in nature, if one be required, should be conducted on the basis of the property interests *of the taxpayer*, not of third parties not involved in the litigation. The several years of utility of a Metro Study and the long-lasting utility of a well-sited, licensed, operational branch bank obviously had separate and distinct property values or interests *for the bank* when it incurred the cost of their acquisition. Since only part of their utility has been used up, the pro rata property interest of the remaining, not exhausted portion still exists. While it may not be practicable for NCNB Corporation to sell partly used Metro Studies or branch banks to a third party, it is patent that they have continuing value to the bank.

Thus, while we regard the property interest requirement as bogus, nevertheless, properly understood, the branch banks, Metro Studies, and feasibility studies constituted separate and distinct property interests to the extent they had not been exhausted as of the end of each tax year. *Cf. Georator Corp. v. United States*, 485 F.2d 283, 285 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974):

it considered indistinguishable from that in *Colorado Springs* and in which the court chose to "adopt" the Tenth Circuit's decision.

37. *See Georator Corp. v. United States*, 485 F.2d 283, 284 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *Darlington-Hartsville Coca-Cola Bottling Co. v. United States*, 393 F.2d 494, 496 (4th Cir.), *cert. denied*, 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968); *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir.), *vacated on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (per curiam), *original holding on this issue reaffirmed*, 354 F.2d 410 (4th Cir. 1965); *Houston Natural Gas Corp. v. Commissioner*, 90 F.2d 814, 816 (4th Cir. 1937); *Colony Coal and Coke Corp. v. Commissioner*, 52 F.2d 923, 924 (4th Cir. 1931) (per curiam); *Gauley Mountain Coal Co. v. Commissioner*, 23 F.2d 574, 576–78 (4th Cir. 1928).

Nor is it necessary that an expenditure increase the value of an asset in order to be classified as a capital expenditure. . . . Costs of defending title to property, although adding nothing to the value of the property have been held to be capital expenditures.

## C. *The Future-Benefits Rule*

 Taxpayer has argued that the only possible grounds for carrying forward the contested expenditures would be a rule that required capitalization of all expenditures which produce for the enterprise in question a future benefit (*i. e.* a benefit beyond the current tax year). Taxpayer says this rule was rejected in *Lincoln Savings and Loan* and in *First National Bank of South Carolina v. United States,* 558 F.2d 721 (4th Cir. 1977) (per curiam), *distinguished, Jack's Cookie Co. v. United States,* 597 F.2d 395 (4th Cir.), *cert. denied,* 444 U.S. 899, 100 S.Ct. 207, 62 L.Ed.2d 134 (1979). As we have shown, however, the result we reach is compelled by the statutory requirement of a method of accounting which will "clearly reflect income" by recognizing in the same tax year both gross revenues and the costs of producing those revenues. Our result is not tainted merely because it would have been nearly the same if we had blindly and simplistically followed a future-benefit rule.

 The rule, in fact, closely approximates generally accepted accounting principles and thus in many and probably most cases, will accurately reflect income. So, when there is no discernible future benefit, a current expenditure should be expensed (under I.R.C. § 162), or a past expenditure now carried as an asset should be written off and expensed (under I.R.C. §§ 165, 167).[38] Conversely, when there are discernible future benefits from an expenditure, there very often will be a cause and effect relation between the expenditure and revenues to be received during future periods. *APB Statement 4, supra,* §§ 157–158. Even when there is no direct means of associating the expenditure and later revenues as cause and effect, there will almost always be a way systematically and rationally to allocate the cost among the periods in which benefits are provided. *See id.* § 159.

As taxpayer points out, however, the Supreme Court has stated, in often-appealed-to dicta, "[T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year." *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. at 354, 91 S.Ct. at 1899 (dictum). The Court presumably had in mind several situations involving considerations of pragmatism and uncertainty in which, with the blessing of the Commissioner, taxpayers may deduct currently certain expenditures, notwithstanding the presence of probable future benefit.

The Commissioner allows current deductions for some repair and educational expenditures which will benefit a taxpayer during subsequent tax years.[39] In addition, Congress has made many exceptions to the general rule, for instance, by providing for the current deductibility of research and experimental expenditures. *See* I.R.C. § 174.[40] Finally, there is a residuum of current expenditures which will have some future benefit but which "cannot, as a practical matter, be associated with any other

---

**38.** *Cf. APB Statement 4, supra,* § 160. ("Some costs are associated with the current accounting period as expenses because (1) costs incurred during the period provide no discernible future benefits, (2) costs recorded as assets in prior periods no longer provide discernible benefits . . . .")

**39.** *See* Treas.Reg. §§ 1.162–4, 1.162–5.

**40.** *Cf.* Financial Accounting Standards Board, *Statement of Financial Accounting Standards* *No. 2: Accounting for Research and Development Costs* (1974) (holding that in light of the high failure rate among new products, the usual absence of a demonstrably direct relation between experimental R&D costs and future revenues, and the correspondingly high degree of uncertainty about the existence of future benefits of individual experimental R&D projects, such R&D costs should be charged to expense when incurred).

period"[41] and allocation of which "either on the basis of association with revenue or among several accounting periods is considered to serve no useful purpose.[42] These also are currently deductible. An example might be the salary of a high corporate officer whose time is not practically allocable between present operations and future projects.

We emphasize that we do not reach our conclusion purely because the benefits are future benefits, without consideration of the occasions on which it is appropriate to depart from the future benefits rule. On the contrary, we have noted that application of the rule in this case will "clearly reflect income", and does not fall into such situations as the one-year rule or a not-worth-the-trouble exception. Nor does it present a situation in which the Congress or the Commissioner has authorized a departure from the customary requirement that costs should match income. We are content that we have reached a result "that comports with accounting and taxation realities",[43] that we have applied "[a]ccepted accounting practice and established tax principles."[44]

IV.

■ Most of our attention has been devoted to the error which approved full expensing by the taxpayer of 100% of the expenditures. Yet, we wish to emphasize that it is altogether probable that, on an amortization basis, portions of the expenditures were deductible in one or more of the years which have been litigated. On remand, the district court should investigate the relevant facts.

With that thought in mind, we set forth some considerations which may prove helpful.

Because the marketing environment described in a "Metro Study" changed not over days but over months and years, the studies appear to have had useful lives of at least several years. Whether or not it was possible to associate, as cause and effect, the use of a Metro Study and some subsequent revenues, it was certainly possible systematically and rationally to allocate the cost of the study among the accounting periods during which it was economically valuable to the taxpayer.

If, as we suspect, the marketing characteristics of the areas studied are changing sufficiently rapidly for the Metro Studies to have a determinate useful life, then taxpayer may amortize the cost of the studies over that life.

■ It is thus entirely possible that, when additional evidence is gathered, it will eventuate that one or more of the Metro Studies is amortizable during at least one of the tax years *sub judice*. Whether any of a Metro Study's amortization allowance is deductible in a tax year before the district court will depend on whether the Metro Study has been used in part in the production of current revenues recognized in that year. The amount of the amortization allowance which may be charged against current revenues is controlled by *Commissioner v. Idaho Power Co.*, since the Metro Studies have played and are playing a role exactly analogous to the role played by Idaho Power Company's trucks. The District Court must, therefore, make a finding concerning the amount of use of the amortizable Metro Study in taxpayer's *current* revenue-producing operations and the amount of use of the study in the planning for, and implementation of, new facilities for *future* use in its revenue-producing operations.

■ If the court finds that taxpayer did make some use of the Metro Studies in its current-revenue-producing operations, then even if no better than a rough guess is possible, some allocation should be made, and the resulting fraction of the amortization allowance may be taken as a current deduction. As Judge Learned Hand wrote

**41.** *APB Statement 4, supra*, § 155.

**42.** *Id.* § 160.

**43.** *Commissioner v. Idaho Power Co.*, 418 U.S. at 10, 94 S.Ct. at 2763 (1974).

**44.** *Id.* at 12, 94 S.Ct. at 2764.

in *Cohan v. Commissioner,* 39 F.2d 540, 543–44 (2d Cir. 1930):

> Absolute certainty in such matters is usually impossible and is not necessary; the [trial court] should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was [properly allocable to current expense] .... The amount may be trivial and unsatisfactory, but [if] there was basis for some allowance, ... it [would be] wrong to refuse any .... It is not fatal that the result will inevitably be speculative; many important decisions must be such.

■ The feasibility studies should be treated analogously to the Metro Studies. If the feasibility studies retain their utility for taxpayer beyond a single tax year, the portions of their cost allocable to future periods may not be expensed immediately but must be carried forward for amortization and/or write-off in subsequent tax years. If the cost is so carried forward, then, once amortization begins, an allocation is to be made between use in the planning or realization of future branches and use, if any, in the production of currently recognizable revenues. The present record suggests that feasibility studies were so location specific that they played no role in the production of current revenues. But since the case must be remanded anyway for further factfinding, the parties should be free to adduce additional evidence which is relevant to the legal issues presented, and the District Court should remain free to make appropriate findings of facts on the total record then before it.

■ Any internal costs which are properly allocable to the generation of a Metro Study or a feasibility study should be dealt with the same way as the external costs of obtaining that study. As we indicated in *First National Bank of South Carolina v.*

*United States,* 558 F.2d 721, 723 (4th Cir. 1977) (per curiam), it makes no difference for purposes of § 162(a) or of § 263(a) whether a particular expenditure is internal or external. *See Commissioner v. Idaho Power Co.,* 418 U.S. at 14, 94 S.Ct. at 2765 (construing § 263(a) in a manner that maintained "tax parity" between taxpayers who do their own construction work and those who have their construction work done by independent contractors).

The principles which have just been described regarding allocation of the amortization of a Metro Study or a feasibility study also apply to the other external and internal costs at issue in this case.

## V.

Because the District Court was using the wrong legal standard, it failed to make findings regarding disputed allocations of the costs at issue. Accordingly, we vacate the judgment of the District Court and remand the case for further proceedings, including, to the extent appropriate, the taking of additional evidence.

*VACATED AND REMANDED.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I think it a mistake to characterize the legal standards used by the district court as oversimple and incorrect.

To commence, I think it should be emphasized, as found as a fact by the district court and not contested by the government, that "[t]he tax treatment of the cost of physical facilities of and equipment in new branches is not involved in this suit." Thus, we are dealing only with intangibles.

While I may be in peripheral agreement with certain parts of the opinion of the majority, trying to pick out such parts[1] would serve no useful purpose, for I am in disagreement with the basic theme of the opinion.

---

1. Certain smaller items of expense may be so closely associated with the acquisition of land

it could be argued they are a part of its cost.

That theme is this, although somewhat disavowed at one place in the opinion:

The matching of costs and revenues, taken to its logical extreme by an absolute version of the one year rule, states the only true rule as to when an item of expense should either be deducted or capitalized. Most other factors, including well considered opinions of this and other courts, are discarded as verbalisms, talismans, and rules of thumb.

The sense of the majority opinion is disclosed by quotations from it, as is its departure from the teaching of *Lincoln Savings and Loan.*

"The question, therefore, is to what extent, if at all, the expenditures were also 'ordinary', *i. e.,* were current, were part of the cost of producing the income which is reported on the disputed income tax returns. It is a matter of timing, the selection of the proper tax year or years against whose revenues the expenditures should be set off." P. ——.

"Obviously the question then becomes one of accounting. . . ." P. ——.

"The rule expressed by Judge Sobeloff [in *Richmond TV*] requiring the matching of revenues and costs in the appropriate period, is, indeed, a basic concept of generally accepted accounting principles." P. ——.

" . . . the outlay [for acquisition of assets] is nevertheless most properly matched against some future period's revenues which the benefits will help produce. This matching is without regard to whether the benefits are tangible or intangible and also without regard to their realizability, through sale or otherwise. The critical factor is the accounting period in which the associated revenues are to be recognized, not the nature of the benefits which help produce those revenues. Whether the deferred charge has some separate identifiable worth is irrelevant to the accounting process as it is applied." P. —— – ——.

"For half a century, this court has required the Commissioner and taxpayers to match expenditures with the revenues which those expenditures help produce. . . ." P. ——.

The opinion, consistent with its theme, then describes the opinion of the Second Circuit in *Briarcliff Candy Company* that *Lincoln Savings and Loan* had "brought about a radical shift in emphasis in construing § 162(a)" as an "unfounded assertion." P. ——.

It quotes as yet authoritative *Richmond TV* as follows:

"A taxpayer may, therefore, not deduct as a current business expense the full cost of acquiring an asset, tangible or intangible, which benefits the taxpayer for more than one year."

and adopts that opinion's quotation from *Akin* that

" '[A]n expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year, or if it secures a like advantage to the taxpayer which has a life of more than one year.' " P. ——.

Contrast the quoted language with that of *Lincoln Savings and Loan*:

"Further, the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

"What is important and controlling, we feel, is that the § 404(d) payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense. . . ." 403 U.S. at 354, 94 S.Ct. at 1899.

It is at once apparent that the majority persists in following the language of *Richmond TV*, although that principle has since been modified by *Lincoln Savings and Loan.* This is most strikingly illustrated by the majority's deciding that the "critical factor," p. ——, is the accounting period in which the associated revenues are to be recognized, which is in the teeth of the statement of the Supreme Court that "the

presence of an ensuing benefit that may have some future aspect is not controlling." I suggest that our description of a future accounting period as critical when the Supreme Court describes the same as not controlling is a failure to recognize the effect of *Lincoln Savings and Loan* on *Richmond TV* and the older cases.

In *Lincoln Savings and Loan*,[2] the Supreme Court, at pages 355–356, 94 S.Ct. at 1899–90, in support of its requirement of a separate and distinct additional asset, goes into detail to show that the loan association had a property-interest in the fund involved. This is best shown by its language that "The insured institution has a distinct and recognized property interest in the Secondary Reserve." 403 U.S. at 355, 94 S.Ct. at 1899. The court also pointed out that the reserve fund had seniority, that the accounting rules of both national and state governments required the fund to show as an asset on the balance sheet, and that the segregated fund was more permanent than temporary. These the Supreme Court considered supporting factors for its conclusion that the fund involved was a separate and distinct additional asset. Contrast our language at p. —— in which we say that:

> "Thus, while we regard the property interest requirement as bogus, nevertheless, properly understood, the branch banks, Metro Studies, and feasibility studies constituted separate and distinct property interests to the extent they had not been exhausted as of the end of each tax year."

The studies aside, the opinion does not explain how a branch bank could be exhausted in any event, or, indeed, how the studies could be exhausted. Even if the existence of a distinct and recognized property interest may not be a *sine qua non* of capitalization, nevertheless I suggest that it is an important factor in determining whether a separate and distinct asset exists and that a description of this factor as bogus is again simply not following *Lincoln Savings and Loan*.

Consistent with its central theory, the majority downplays two lines of cases, the holdings in which are directly contrary to the result it obtains in this case.

The first cases concern bank credit cards in their various forms, the initial one of which was *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974). That case was followed by this circuit in *First National Bank of South Carolina v. United States*, 558 F.2d 721 (4th Cir. 1977), and *Iowa-Des Moines National Bank v. C.I.R.*, 592 F.2d 433 (8th Cir. 1979), and *First Security Bank of Idaho v. C.I.R.*, 592 F.2d 1050 (9th Cir. 1979). In each of those cases, the bank involved had wished to commence participating in consumer credit plans evidenced by credit cards, with which we are all familiar, known as Bank Americard and Master Charge. The facts are generally the same in each case, and are to the effect that starting-up expenses of the credit card system such as computer costs, computer services, advertising, and commercial costs, credit bureau reports, travel, educational and entertainment expenses, and temporary clerical services were claimed by the banks involved as deductible business expenses. In the case of *First National Bank of South Carolina*, the payment was in the form of an assessment made for ownership of a share of a nonprofit corporation formed to operate a computerized system for recordkeeping, authorization, and billing of credit card transactions. Although benefits, and thus the revenues, of these start-up expenses were received by the banks involved in taxable years following that in which the initial payments were made, the courts in each case authorized the start-up payments to be taken as business deductions rather than requiring them to be capitalized as sought by the United States. Of particular importance in the case now before us is that *First National Bank of South Carolina* reasoned

---

2. The fund in question in *Lincoln Savings and Loan* was a reserve fund required to be established by statute and required to be carried as an asset by regulatory authorities. While not immediately available for use, it could have ascertainable value to the association under certain conditions.

that "[m]embership in ASBA is not a separate and distinct additional asset created or enhanced by the payments in question. The assessments were made solely to meet *pre-operational expenses.* Had the Bank set up an in-house computer system, there would be no quarrel over the deductibility of amounts expended for salaries, office expenses, rentals, advertising and the like. Forming a non profit cooperative association instead to minimize costs does not alter the character of the expenditures." 558 F.2d at 723. The court then went on to hold that *Colorado Springs* was indistinguishable from the case at hand and quoted with approval *Colorado Springs* as follows:

> " 'The start-up expenditures here challenged did not create a property interest. They produced nothing corporeal or salable. They are recurring. At the most they introduced a more efficient method of conducting an old business.' " 558 F.2d at 723, quoting 505 F.2d at 1192.

The start-up expenses of a credit card system, including non-salable ownership in its operation, and the expenses leading up to the establishment of branch banks, I submit, are indistinguishable. The benefits of each inure to the bank in taxable years following the one in which the expenditure was made. The asset is intangible, and, indeed, in the case of expenditures involved in branch banking, the separate and distinct additional asset is no more separate or distinct than the asset of membership in the credit card association or ownership of a non-salable share of the credit card operating company as the case may be. This point is underscored in our case because the physical assets of the various branch banks are not at issue in this proceeding. It is only the other expenditures involved in branch banking which the Commissioner seeks to capitalize in the case before us. As we said in *First National Bank*, quoting the *Colorado Springs* court, expenditures involved here "produced nothing corporeal or salable. They are recurring. At the most they introduced a more efficient method of conducting an old business."

The other line of cases which ought to have been applied here are those cases which allow deductions for expansions of an existing business. A case indistinguishable on its facts from the one at hand is *Briarcliff Candy Company v. C.I.R.,* 475 F.2d 775 (2d Cir. 1973). Two cases from this circuit on facts somewhat different from the case at hand have arrived at the same result as *Briarcliff.* They are *York v. Commissioner,* 261 F.2d 421 (4th Cir. 1958), and *Malmstedt v. Commissioner,* 578 F.2d 520 (4th Cir. 1978).

*Briarcliff,* the candy company involved, for years had made the majority of its sales through its own retail stores located in the thickly populated urban centers in the Northeast. The demographic phenomenon of population shift from urban centers to the suburbs compelled the business to take measures to meet the change in the interest of survival.

The candy company at first sought to retain its customers by opening retail stores in the suburbs, but such stores attracted insufficient sales volume. This program being unsatisfactory, it instituted a program of soliciting independently operated retail outlets such as drugstores, card stores, etc., to market its products under the terms of franchise agreements. These franchise agreements were formal agreements remaining in operation for terms of one to five years after the initial term and continuing from year to year unless terminated by one of the parties. The candy company expanded its advertising in trade journals, circularized by direct mail, and made telephone calls and personal visits by salesmen. Out of 600 appointments arranged, 159 franchise contracts were entered into. The operating cost of the franchise division was claimed by the taxpayer as a business deduction. The Commissioner, however, segregated the operating expenses of the franchise division into promotional expenses and recurring operational expenses. The promotional expenses the Commissioner considered to be for capital assets consisting of the 159 valuable franchise contracts. The Tax Court upheld the Commissioner, and the Second Circuit reversed. The court em-

phasized in its opinion that part of *Lincoln Savings and Loan* I have quoted here, to the effect that the presence of an ensuing benefit that may have some future aspect is not controlling, and that the controlling feature is the creation or enhancement of what is essentially a separate and distinct additional asset. I agree with the Second Circuit when it describes *Lincoln Savings and Loan* as bringing about a radical shift in emphasis. While the presence or absence of a benefit having some future aspect is certainly a factor yet to be considered, we may no longer consider it as controlling and must consider the creation or enhancement of a separate and distinct additional asset as the factor which must control our decision. I grant that *Richmond TV* and other cases had laid down the rule that the matching principle was controlling, but I submit that *Lincoln Savings and Loan* has changed all that. The court in *Briarcliff* reasoned that the franchise contracts were not capital assets because they had no "ascertainable and measurable value—that is, a value in money or a fair market value." 475 F.2d at 784. The court also reasoned that the words "capital asset" "must be taken in their usual and customary business sense as items of ownership of a permanent or fixed nature which are convertible into cash." 475 F.2d at 786. The court concluded that "[t]he facts of this case bring it squarely within the long recognized principle that expenditures for the protection of an existing investment or the continuation of an existing business or the preservation of existing income from loss or diminution, are ordinary and necessary within the meaning of § 162 and not capital in nature." 475 F.2d at 787.

*York* was a case involving as a taxpayer a real estate agent who had been involved in handling residential and commercial real estate. Because of his success, he was solicited to take over the direction of the affairs of a corporation organized to promote the industrial development of real estate. He conditioned even consideration of acceptance of the position upon obtaining an expert survey of the industrial properties of the land involved by a reputable and gener-

ally accepted institute of research, the fee for which would be paid one-half by the taxpayer and one-half by the landowner. For reasons the opinion does not disclose, the taxpayer never signed an agreement with the landowner to develop the property, and claimed the money he had spent on the expert survey as a business deduction. The Tax Court held that this was an exploratory expenditure to determine whether he should venture into a new business. This court, however, reversed the Tax Court and held that the payment was for professional consultation and advice on a subject well within the calling of the taxpayer, and that it could not under the evidence be classed as a new pursuit apart from his general occupation. The court held the fee for the survey was deductible in the face of a claim by the United States that the sum should have been capitalized as a preliminary expenditure to entering into a new business. A quite significant thing about the opinion is that it allows a deduction for an investigation made in contemplation of the expansion of an existing business, not different from the Metro reports involved in the case at hand.

In *Malmstedt*, the taxpayer again was a real estate agent engaged in real estate development. She acquired some property near property previously developed. The purchase money for the property subject to the prospective development was secured by a lien on the land. While the taxpayer held the land, she paid interest on the loans against it and taxes on the real estate. Subsequently, the land was sold at foreclosure proceedings for default in payments on the loans. The Commissioner claimed the interest and tax payments paid while the taxpayer held the land were not deductible because the property subject to the prospective development was commercial, while the taxpayer's previous real estate development experience had been in residential property. Thus, as in *York*, the claim of the government was that the taxpayer was involved in a new business. The Commissioner also claimed that the prospective development was of much greater size than that in which

the taxpayer had previously been engaged. The court rejected both contentions of the government, stating that "whether the questioned activity represents simply the normal expansion of the existing business or whether it is within the 'compass' of the existing business,—which is determinative of whether the questioned activity represents a new and unrelated business venture for the purposes of applying § 162." The court held the interest and tax payments were deductible. 578 F.2d at 527.

I submit there is no significant difference between the facts of *Briarcliff Candy Company* and the case at hand, and little difference between the facts of *York* and *Malmstedt* and the case at hand. The question in *Briarcliff* is whether the expenditure should have been capitalized or deducted. The question in *York* and *Malmstedt* is whether the expenditures should have been deducted, and implicitly whether capitalization was required as expenses attendant to a new business. In each case, the court held that the expenditures were deductible. In our case, as in these three cases, the expenditures involved were for expansion of an existing business in which the taxpayer had been previously engaged. In *Malmstedt*, the taxpayer was even allowed to deduct expenses attendant to holding a tangible asset acquired in the ordinary course of business. In *Briarcliff*, as here, the court did not require capitalization because the taxpayer had no real disposable property interest. All these cases stand for the proposition that a business may deduct its expenses in ascertaining whether to expand its existing business as well as in the actual expansion thereof,[3] although the prospective benefits of business expansion would, of course, inure to the taxpayer in taxable years subsequent to those in which the expense was incurred or paid.

Finally, there are two items which deserve mention, the first of which is *Jack's Cookie Company v. United States*, 597 F.2d 395 (4th Cir. 1979).[4] The majority, I believe incorrectly, construes *Jack's Cookie Company* as not being inconsistent with its opinion. To the contrary, the opinion, at page 406, citing *Lincoln Savings and Loan*, said this:

"There the taxpayer, like Jack's, interposed the annual accounting concept of the income tax as a factor which required that a current deduction be allowed, but the Court viewed that argument as having little bearing upon 'the determination of whether an item is or is not an ordinary expense.'"

*Jack's Cookie* was a case in which a tenant as a part of its monthly rental payment on a building financed by bonds issued pursuant to a state statute contributed to a reserve fund required by the statute which could have been applied to its account under some circumstances but not under others, much like the fund in *Lincoln Savings and Loan*. The court decided that *Jack's* was not entitled to a current deduction for its payment into the reserve fund, but the reasoning of the case, I submit, requires judgment in favor of the taxpayer here. *Jack's Cookie* followed *First National Bank* and correctly noted that that case was affirmed *on the opinion* of the district court. In connection with that fact, the court noted that the district court had held, which, of course, is a part of our circuit precedent, that "the bank had no salable asset from which it could recoup its assessments," and thus "the assessments could not be regarded as creating for the bank 'anything remotely similar to the' 'distinct and recognized property interest' 'which the court in *Lincoln Savings* found that the taxpayer had acquired.'" 597 F.2d at 404. Whether this is a construction of *First National Bank* by a panel of this court or merely a recital of *First National Bank* makes no difference;

---

3. Of course the purchase price of realty, etc., should not be deducted.

4. *Georator* was decided under the one year rule with no reference to the separate and distinct asset requirement of *Lincoln Savings and Loan*. That case did not consider whether there was a separate and distinct asset, as it need not have, because the suit concerned expenses in defense of a petition to cancel a trademark. Thus, whether there was or was not a separate and distinct asset was not at issue.

it is circuit precedent. The court further discussed the *Colorado Springs* case from the Tenth Circuit from which "we imported the one year rule." It explained that the rule is intended to serve as a mere guidepost, not as an absolute rule requiring automatic capitalization of every asset providing the taxpayer with a benefit enduring for a period of more than one year. It described the one year rule as "not, in itself, talismanic," 597 F.2d at 404, and further indicated that "we have never indicated that capitalization of an item is required on that basis alone." Id. The court explained that the rule is of especial value in its negative application, that is to say, that an expenditure resulting in benefits which are realized and exhausted within the taxable year should not be capitalized in any event. And the court stated in terms that the rule "cannot be applied inexorably in the other direction," id. at 405, so that "that fact alone is insufficient to *require* such treatment." Id. The case, I think, correctly construes *Lincoln Savings and Loan* as it quotes those parts of that opinion as "the standard by which capital expenditures are to be distinguished from ordinary expenses." 597 F.2d at 404. It calls to our attention that *Lincoln Savings and Loan* cautions that the future benefit aspect of capitalized costs should not be emphasized or applied to the exclusion of other essential features which it identified generally as those possessed by assets. While, as I have mentioned, the majority opinion in this case describes the property requirement as bogus, the opinion in *Jack's Cookie* reasoned that the fact that *First National Bank* did not mention the one year rule was because its application was unnecessary "because the assessments in issue were found to lack another characteristic of equal moment under the 'separate assets' test, i. e., they did not create for the bank a property interest in anything of intrinsic or salable value." 597 F.2d at 405. Thus, *Jack's Cookie* based its holding on the property interest requirement in direct contrast to the panel opinion which simply does not recognize it.

In the district court opinion in *First National Bank*, 413 F.Supp. 1107, 1112 (D.S.C.

1976), which we adopted, the court, as a part of its reasoning, relied on a letter from the Comptroller of the Currency with respect to the claimed deductions there under consideration. The same reasoning should apply here:

"The Comptroller of the Currency who is charged by Congress with supervision and regulation of national banks has ruled that expenditures by commercial banks for the development and implementation of credit card programs must be charged to expense rather than capital. In an August 21, 1972, letter to the Assistant Secretary for Tax Policy, U. S. Treasury Department, he wrote that:

It is the long-established policy of this Office to require National Banks to charge to current operations all expenditures relating to the development and expansion of banking services, including those incurred in credit card programs. This policy has as its basis our responsibility of assuring the solvency and liquidity of National Banks and the concurrent protection of depositories and shareholders.

"In addition, the Comptroller stated his opinion that if the current deduction of such expenditures is disallowed,

banks will be reluctant to expend funds to develop, expand, and make technological advances in banking services. Clearly, such a result would be contrary to the objectives of our expanding national economy."

There is no argument that some, although not controlling, weight must be given to the Comptroller's views. There is also no argument to the fact that the accounting methods required by the Comptroller must be given some weight. *Idaho Power Company* at pp. 14–15, 94 S.Ct. at 2765. Indeed, *Idaho Power Company* indicates that where methods of accounting are required by regulatory agencies and that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences. *Idaho Power Company* at p. 15, 94 S.Ct. at 2765.

In our case, I repeat that the money spent on branch bank expansion which might well be capitalized is not a part of this case. We deal only with intangibles which in proper perspective are used as a part of the decision making process of the bank. The taxpayer is in the regular day to day business of branch banking. This is nothing new. It must compete or die. To this end, it employs consultants to prepare Metro Studies, and itself prepares feasibility and other more precise studies of prospective locations to open or close branch banks. The money spent on the Metro Studies and the money spent on the salaries, etc., involved in the decision making process of the bank, as well as carrying out that process until the physical facility is obtained, is nothing more nor less than the expenses any merchant or manufacturer must bear if it is to stay in day to day competition with its competitors. The principal future benefit that such intangibles can be said to produce is that the bank has become wiser after spending the money, and this by its acquisition of additional knowledge. The additional knowledge is then used in its decision making process. Whatever benefit the bank has gained from these studies is not salable, and this is acknowledged by the government, and it has no intrinsic ascertainable value. The only way the fruits of these expenditures could be called separate and identifiable is because they were made for a given purpose, but that is true for every expenditure, capital as well as deductible. There is no fund here as in *Lincoln Savings* and *Jack's Cookie* which is segregated and from which the taxpayer may derive an ascertainable benefit upon given conditions. Far from that, a new branch is only an extension of existing business. I submit that the expenditures involved in this case meet every criteria for business deductions set out in *Jack's Cookie, First National Bank, Briarcliff, York*, and *Malmstedt*, and that the method of accounting required by the Comptroller of the Currency more nearly reflects income than does the method which would be imposed on the bank by the majority opinion. There is no way the benefit to the bank by the expenditures involved can be measured with any degree of precision, and any entry of those amounts on the accounts of the bank as assets of dollar value would necessarily not reflect income. Neither would they reflect a statement of the bank's financial position, rather a strained statement of assets to conform with a supremacy of the matching principle and the one year rule which position has been disavowed by the Supreme Court in *Lincoln Savings and Loan*.

Thus, I would affirm the judgment appealed from.

